Brandon J. Mark (USB 10439)
Michael Young (USB 12282)
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 532-1234
Facsimile: (801) 536-6111
bmark@parsonsbehle.com
myoung@parsonsbehle.com

Tejinder Singh (PHV pending)
SPARACINO PLLC
1920 L Street, NW
Suite 835
Washington, DC 20036
Telephone: (202) 629-3530
tejinder.singh@sparacinopllc.com

*Attorneys for Relators*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. DR. KARL BROWN, SHANNON NELSON, and HALI STANYON, <br><br> Plaintiffs and Relators, <br> vs. <br><br> HCA HEALTHCARE, INC.; MOUNTAIN DIVISION INC.; NORTHERN UTAH HEALTHCARE CORPORATION d/b/a ST. MARK'S HOSPITAL; TIMPANOGOS REGIONAL MEDICAL SERVICES, INC. d/b/a TIMPANOGOS REGIONAL HOSPITAL; COLUMBIA OGDEN MEDICAL CENTER, INC. d/b/a OGDEN REGIONAL MEDICAL CENTER; AND DOES 1-500, INCLUSIVE, <br><br> Defendants. | **RELATORS' FIRST AMENDED COMPLAINT** <br><br><br> Case No. 2:19-cv-00525-HCN-DAO <br><br> Judge Howard C. Nielson <br><br> Magistrate Judge Daphne A. Oberg <br><br><br> JURY TRIAL DEMANDED |

1

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................3

    A.  Defendants Have Systematically Overcharged the Utah Medicaid Program for NICU Services and Have Fraudulently Obtained "Outlier" Payments as a Result. After Being Caught by Relators, Defendants Failed to Account for and Return the Overpayments. ...........................................5

    B.  Summary of the Scheme...................................................8

II.   JURISDICTION AND VENUE. ..................................................... 12

III.  THE PARTIES. ............................................................................ 14

    A.  The Relators. ............................................................. 14

    B.  The Defendants. ......................................................... 16

    C.  The False Claims Act. .................................................. 18

IV.  FALSITY: THE INFLATED PAYMENT CLAIMS. ......................... 22

    A.  Through their Billing Practices, Defendant Hospitals Are Evading Mandatory Coding Rules that Facilitate Required Level-of-Care Reviews by MCOs and Utah Medicaid. ............................................................ 22

    B.  After learning of the existence of the allegations in this case, Defendant Hospitals used their economic leverage over Molina to coerce Molina into a payment scheme that (1) continues the overpayments to Defendant Hospitals and (2) attempts to evade the DRG payment system altogether. ............................................................................ 74

    C.  Rate Arbitrage Helps Both Molina and Defendant Hospitals Increase Profits at the Expense of the Medicaid Program. ................................... 101

    D.  Statements and Claims: Defendants Have Submitted Numerous False Claims for Payment and Certifications of Compliance to Utah's Medicaid Program and CMS. .......................................................... 110

    E.  Materiality: Defendants' False Certifications and Claims Are Material. 117

    F.  Scienter: Defendants Knowingly Made False Certifications and Knowingly Submitted False Claims....................................... 125

V.   CLAIMS FOR RELIEF.............................................................. 130

    A.  First Claim for Relief: Overcharging under 31 U.S.C. § 3729(a)(1)(A) 130

B.    Second Claim for Relief: Express False Certifications under 31 U.S.C. § 3729(a)(1)(A). ...................................................................................... 132

C.    Third Claim for Relief: Implied False Certifications under 31 U.S.C. § 3729(a)(1)(A). ...................................................................................... 134

D.    Fourth Claim for Relief: False Records or Statements under 31 U.S.C. § 3729(a)(1)(B). ...................................................................................... 136

E.    Fifth Claim for Relief: Causing MCOs to Present False Claims under 31 U.S.C. § 3729(a)(1)(A). ...................................................................... 138

F.    Sixth Claim for Relief: Reverse False Claims under 31 U.S.C. § 3729(a)(1)(G). .................................................................................... 139

G.    Seventh Claim for Relief: Conspiring to Commit Violations of 31 U.S.C. § 3729(a)(1). .................................................................................. 140

VI.    PRAYERS FOR RELIEF ............................................................... 141
VII.    JURY TRIAL DEMAND ............................................................... 142

Pursuant to the False Claims Act, 31 U.S.C. §§ 3729–33, Relators and Plaintiffs Dr. Karl Brown, Shannon Nelson, and Hali Stanyon (collectively, "Relators"), on behalf of themselves and the United States of America, complain as follows:

I.      **INTRODUCTION**

1.      The Utah Medicaid program reimburses hospitals for providing medical care to eligible pregnant women and their infants during and after birth, including medical care for premature and sick infants in the hospitals' Neonatal Intensive Care Units ("NICUs"), which are often among the most expensive hospital services covered by Medicaid.

2.      This Complaint outlines the manner in which three Utah hospitals—St. Mark's, Timpanogos, and Ogden Regional ("Defendant Hospitals")—which are owned and operated by one of the nation's largest hospital chains, HCA Healthcare, have (1) made false claims and statements to obtain inflated payments from the Utah Medicaid program relating to treatment of Medicaid-eligible patients in the Hospitals' NICUs from approximately 2011 until at least 2024, and (2) failed and refused to refund those fraudulently obtained inflated payments despite having actual knowledge about them for many years. Indeed, after initially denying any problems with the charges for

months, Defendant Hospitals acknowledged years ago that the systematically inflated charges were wrongly billed. Despite that admission, Defendant Hospitals knowingly *continued* to submit the *same* types of false claims with the *same* inflated charges for many years.

3.        In particular, Defendant Hospitals suggested during a December 2018 meeting that they would continue to bill the inflated charges until at least April 2019 because they had so many billing errors, in so many states, it would to take until at least April to fix the problem. Defendant Hospitals' admissions regarding their need to roll out the "fix" for these billing problems to the hospitals in other states first—because the hospitals in other states handle a larger number of claims—suggest that the problems identified in this Complaint are not isolated to the three Defendant Hospitals at issue and instead may exist at other HCA hospitals in other states. No "fix" was eve implemented and Defendant Hospitals continued to bill Utah's Medicaid system using the inflated charges.

4.        Based on an analysis of claims billed between 2015 and portions of 2018 from the Medicaid Managed Care Organization ("MCO") that received the largest number of claims from Defendant Hospitals during the period in question, Defendant Hospitals billed Utah's Medicaid *an average* of

$32,614 more *per NICU claim* as compared to every other hospital in the state. Proportionally, Defendant Hospitals' NICU charges during this period exceed the charges of all other hospitals in Utah by more than $13 million dollars. These inflated charges have resulted in Defendant Hospitals receiving millions of dollars more in "outlier" payments than their counterparts.

5.      This is a Medicaid version of a practice that the United States federal government has sought to curb in the Medicare program known as "turbocharging."

**A.      Defendants Have Systematically Overcharged the Utah Medicaid Program for NICU Services and Have Fraudulently Obtained "Outlier" Payments as a Result. After Being Caught by Relators, Defendants Failed to Account for and Return the Overpayments.**

6.      This Complaint outlines three independent ways Defendants violated the False Claims Act.

7.      *First*, Defendant Hospitals have submitted at least hundreds (more likely thousands) of claims to the Utah Medicaid program, both to managed Medicaid organizations and directly to the state Medicaid program, in which they falsely certified, both impliedly and expressly, that the claims complied with all applicable rules, regulations, and contractual promises, which resulted in Defendant Hospitals receiving far more money from the Utah Medi-

caid program than they were entitled to under the relevant contracts and the applicable regulations and statutes.

8.    As described further below, such fraudulent billing practices resulted in these claims systematically reaching "outlier" status under the Utah Medicaid program's reimbursement system at a far greater rate than other hospitals' claims, which triggered millions of dollars in additional payments to Defendants Hospitals. Defendant Hospitals were not entitled to these outlier payments and would not have received them if they had complied with the applicable program rules and contract obligations, as they promised they would and certified they had.

9.    It is precisely because the Defendant Hospitals failed to comply with applicable regulations, program rules, and contract requirements that these claims became "outliers" in the first place. Of the claims submitted by Defendant Hospitals to one of the four Medicaid MCOs operating in Utah from approximately 2015 to 2018, 70% triggered outlier payments, whereas only 40% of claims submitted by other HCA hospitals operating under the same contract, which did not include the excessive charges, triggered outlier payments. This is a version of a practice commonly known as "turbocharging."

10.     *Second*, by no later than June 2018, Defendant Hospitals were on notice that their claims did not comply (and had not complied) with the applicable rules, regulations, and contractual requirements for payment. After spending months claiming that they were permitted to gouge Utah's Medicaid program by charging the inflated rates, Defendant Hospitals finally admitted in October 2018 that the charges were wrong and had resulted in overpayments to Defendant Hospitals. Defendants stated in December 2018 that they were initiating a nationwide rollout of a "fix" for their admittedly errant system, which would begin in areas affected most by the problems and reach Utah by April 2018. But that never happened. Instead, Defendant Hospitals continued to bill Medicaid using the same inflated charges for many years.

11.     Despite these repeated admissions that they received overpayments, Defendant Hospitals have failed to repay them and have otherwise taken no meaningful steps to repay the overpayments to Utah Medicaid or the other Utah Medicaid MCOs, whom Defendant Hospitals admitted billing in the same way. Instead, Defendant Hospitals have knowingly retained tens of millions of dollars in ill-gotten gains. By failing to repay the identified overpayments within sixty (60) days, Defendant Hospitals have violated the Overpayment Rule, a core anti-fraud measure of the Patient Protection and Afford-

able Care Act ("Overpayment Rule Claims"). Under the express provisions of the ACA, violations of the Overpayment Rule constitute violations of the False Claims Act.

12.     *Third*, Defendant Hospitals and Defendant HCA have extended these violations in recent years by using their economic leverage with one of the MCOs—the MCO that Defendant Hospitals likely bill the most NICU claims to—to coerce the MCO into a payment arrangement that tries to hide the overpayments. Each of the claims submitted under this new payment arrangement compounds the prior fraudulent conduct because the new payment rates are based on the prior overpayments.

13.     As discussed below, Defendant Hospitals' actions and omissions alleged in this Complaint constitute violations of the Federal False Claims Act, 31 U.S.C. §§ 3729-3733.

**B.     Summary of the Scheme.**

14.     Defendant Hospitals systematically submitted claims for inflated charges—that is, turbocharging their submitted claims—to all of Utah's MCOs and to the Utah Medicaid program directly for many years, resulting in the hospitals improperly receiving millions of dollars in reimbursements for supposed "outlier" cases.

15. In particular, Defendant Hospitals have submitted hundreds (or likely thousands) of claims for services provided by the hospitals' NICUs at rates that far exceed the hospitals' "customary charges" for those services and that violate other basic rules and contractual obligations for billing those services.

16. Relevant here, there are several billing codes—known as revenue codes—associated with the costs for NICU accommodations. Care associated with the most critical conditions has certain codes, while charges associated with routine problems are billed using other codes. The codes corresponding to more severe conditions bill at a higher rate. Each code is governed by a specific set of criteria, and the patient's level must be evaluated daily.

17. Although all other hospitals—*including other HCA hospitals in Utah*—bill for services under each revenue code at significantly different rates, Defendant Hospitals billed Utah's Medicaid program for three of the four revenue codes at the *same rate*—a rate equivalent to the highest level, even though the hospitals' own records demonstrate that much lower levels of care were actually provided.

18. By charging for lower-level NICU services at the highest level of care cost, Defendant Hospitals artificially inflated their bills to the MCOs

and to Medicaid directly (aka "fee-for-service claims"). While hospitals are typically paid only a flat fee based on a patient's diagnosis regardless of the charges billed—a Diagnosis-Related Group or "DRG" payment—hospitals can obtain further reimbursements for claims that are so large that they satisfy a predetermined "outlier" threshold.

19.     Once claims cross the outlier threshold, hospitals can qualify for substantially more money from the Utah Medicaid program than they can under the standard DRG rate. These are called "outlier payments," which are supposed to be reserved for claims with costs that are beyond normal variation and are truly an "outlier" from the normal distribution.

20.     Based on an analysis of a randomly selected sample, seventy percent (70%) of Defendant Hospitals' NICU claims between January 2015 and March 2018 to Molina Healthcare ("Molina") generated outlier payments. The practices would have had the same effect on payments from the other MCOs and from Utah's Medicaid program directly.

21.     Pushing their NICU claims into outlier status, which generates outlier payments, was the obvious (and known) result of Defendant Hospitals' billing practices. By avoiding the default base DRG payment rate and tapping

into outlier payment dollars, Defendant Hospitals received substantially more money for each claim than their peers.

22.     Indeed, as explained more fully below, based on an analysis of more than 1,000 claims submitted by Utah hospitals to Molina from January 2015 to March 2018, Defendant Hospitals billed an average of $32,614.09 *more per NICU claim* than all other hospitals and received an average of $17,130.55 *more in outlier payments per NICU claim*[1] than all other hospitals operating in Utah.

23.     After these inflated charges—and the resulting overpayments—were brought to the attention of management for Defendant Hospitals on several occasions, including by Relators and others at Molina, Defendant Hospitals acknowledged the charges were improper. Yet despite promising to correct the problem at some vague future time, Defendant Hospitals did nothing to identify, account for, and repay the past claims for which they were overpaid. Moreover, notwithstanding Defendant Hospitals' claim that they would "fix" their billing system in December 2018 to prevent these inflated

---

[1] This analysis includes all claims billed by a hospital with an outlier multiplier assigned by the Utah Medicaid program, and includes all claims, whether or not they were paid outlier dollars.

charges in the future, Defendant Hospitals continued to bill Utah's Medicaid system using the inflated NICU charges for years.

24.     Defendant Hospitals' failure to identify and repay these overpayments is a separate violation of the False Claims Act.

25.     After learning about the existence of this case while it was pending under seal from the government's investigation, Defendant Hospitals used their economic leverage with Molina—the MCO that received (and still receives) the largest share of their Medicaid claims—to coerce Molina to negotiate a payment structure that effectively avoids the scrutiny Molina gives to most other NICU claims from other providers. This new payment structure was specifically intended to be equivalent to the prior payments Defendant Hospitals received from Molina for the NICU claims, including, in particular, the overpayments Defendant Hospitals had been receiving.

## II.   JURISDICTION AND VENUE.

26.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, and 31 U.S.C. §§ 3730, 3732.

27.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, be-

cause Defendants transact business and are found in this District and because acts proscribed by 31 U.S.C. § 3729 occurred in this District.

28. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because at least one Defendant Hospital, where the alleged violations occurred, operates in this District.

29. As required under the FCA, Relators have provided the United States Attorney and the United States Attorney General with written disclosures of substantially all material evidence and information supporting the allegations herein. 31 U.S.C. § 3730(b)(2).

30. Relators are "original sources" as that term is defined in the FCA. 31 U.S.C. § 3730(e)(4)(B). Relators have independent, material, and first-hand knowledge of the information on which the allegations of fraudulent misconduct are based. Relators voluntarily provided such information to the Office of the Inspector General of HHS and the United States Attorney for the District of Utah on February 25, 2019, and other times.

## III.    THE PARTIES.

### A.    The Relators.

31.    Relator Dr. Karl Brown is a contracted medical director for Molina Healthcare. From approximately June 2017 to June 2018, Dr. Brown was previously the Chief Medical Officer of Utah and Idaho for Molina Healthcare. In these positions, Dr. Brown is (and was) responsible for the quality department and the medical decision-making process of utilization management, including claims adjudication.

32.    When the case was originally filed, Shannon Nelson was a registered nurse in Molina Healthcare's Clinical Appeals and Auditing Department in Utah, where her job duties included reviewing clinical appeals for Medicare, Medicaid, and others claims. Today she is a Director of Payment Integrity with Molina, where she supervises seven nurse reviewers.

33.    Hali Stanyon is a registered nurse who worked in Molina Healthcare's Clinical Appeals and Auditing Department in Utah from February 2016 to May 2019. Her job responsibilities at the time for Molina included reviewing clinical appeals for Medicare, Medicaid, and others claims. Subsequently, she worked for Molina again from April 2023 to May 2025 as a Director of Payment Integrity.

34.     Molina Healthcare of Utah, Inc., functions as an MCO for the Utah Medicaid program. Utah's Medicaid program contracts with Molina and the other MCOs to provide benefits to eligible Medicaid recipients, including payment for inpatient hospital services.

35.     The Utah Department of Health established the MCO system in 2013 in response to the Utah Legislature's directive in 2011 legislation that the Health Department address the escalating costs of healthcare and widespread concerns about the long-term sustainability of the Utah Medicaid program.

36.     There are currently four MCOs with contracts with the Utah Department of Health: HealthChoice Utah, Healthy U, Molina Healthcare of Utah, and SelectHealth Community Care.

37.     Molina currently manages approximately 23% of the Medicaid population in Utah, with the rest divided among the other three MCOs.[2] Because Defendant Hospitals have admittedly submitted similarly false claims and statements to obtain inflated payments to other MCOs (and Medicaid di-

---

[2] Molina has historically had a similar share of the market. *See* https://www.kff.org/state-category/medicaid-chip/medicaid-managed-care-market-tracker/medicaid-mco-level-data/ (last visited April 20, 2026).

rectly), which represent the rest of Utah's Medicaid population, the violations identified below are expected to represent only a fraction of the total false claims submitted to the Utah Medicaid program in the aggregate by Defendant Hospitals.

### B. The Defendants.

38.     Defendant HCA Healthcare, Inc. ("HCA"), is a Delaware corporation with its principal office and headquarters in Nashville, Tennessee. Defendant HCA transacts business and, through various affiliates and subsidiaries, provides inpatient hospital services to patients covered by Medicaid and other federal programs in several states nationwide, including Utah.

39.     On information, including the admissions of representatives of Defendant HCA, Relators believe and allege that Defendant HCA supervises, directs, and permits the billing policies and practices at each of the hospitals it owns and operates, including at Defendant Hospitals.

40.     On information, including the substantial admissions of representatives of HCA as detailed below, Relators believe and allege that Defendant HCA manages and oversees the billing practices of each of its hospitals, including Defendant Hospitals, from its headquarters in Nashville. Defendant HCA has directed and continues to direct the billing practices detailed below,

16

which the other Defendants have carried out under its supervision and control. Indeed, based on admissions of representatives of Defendant HCA, the other Defendants are without authority to deviate from the billing practices and must seek permission to do so from "HCA corporate." Defendant HCA centralizes certain of its billing practices, using a Shared Services Center in Nashville. Indeed, as described and alleged below, certain HCA representatives from the Shared Business Center participated in telephone conferences in which Relators and others flagged the billing practices identified below as incorrect and improper.

41.     Defendant Mountain Division, Inc., is a Utah corporation. Defendant Mountain Division signed a contract relevant to this Complaint on behalf of other defendants, particularly St. Mark's Hospital, Timpanogos Regional Hospital and d/b/a Ogden Regional Medical Center. Defendant HCA describes Mountain Division this way on one of their hospitals' websites: "HCA Mountain Division, [is] a healthcare system of hospitals, clinics and outpatient centers in Idaho, Utah and Alaska."

42.     Northern Utah Healthcare Corporation, d/b/a St. Mark's Hospital ("St. Mark's"), is a Utah corporation. St. Mark's operates a hospital

with a neonatal intensive care unit in Utah, and it participates in Utah's Medicaid program.

43.     Timpanogos Regional Medical Services, Inc., d/b/a Timpanogos Regional Hospital ("Timpanogos Regional"), is a Utah corporation. Timpanogos Regional operates a hospital with a neonatal intensive care unit in Utah, and it participates in Utah's Medicaid program.

44.     Columbia Ogden Medical Center, Inc., d/b/a Ogden Regional Medical Center ("Ogden Regional") is a Utah corporation. Ogden Regional operates a hospital with a neonatal intensive care unit in Utah, and it participates in Utah's Medicaid program.

**C.     The False Claims Act.**

45.     The FCA provides for the award of treble damages and civil penalties for, among other things, knowingly causing the submission of false or fraudulent claims for payment to the United States, or knowingly using a false record or statement material to get false claims paid by the United States. 31 U.S.C. § 3729(a)(1).

46.     The FCA reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986), *available at* 1986 U.S.C.C.A.N. 5266.

47.     First, a defendant violates the FCA when it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Under the FCA, a claim includes a request for money. *Id.* § 3729(b)(2).

48.     Second, a defendant violates the FCA when it "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

49.     Third, a defendant violates the FCA when it "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

50.     Fourth, a defendant also violates the FCA if it "conspires to commit a violation of" any of the prior three statutory provisions. 31 U.S.C. § 3729(a)(1)(C) (identifying subparagraphs (A),(B), and (G), among others).

51.     Under the FCA, the terms "knowing" and "knowingly" mean that the defendant had actual knowledge of or acted in deliberate ignorance or reckless disregard of information relating to the truth or falsity of its claims for payment or its false records or statements. *Id.* § 3729(b)(1)(A).

52.     Proof that the defendant had specific intent to defraud the Government is not required. *Id.* § 3729(b)(1)(B).

53. Congress included "reckless indifference" and "deliberate ignorance" in its definition of the terms "knowing" and "knowingly" to hold a defendant accountable for failing to make the inquiry that a reasonable and prudent person or entity would have made under the circumstances to be reasonably certain that he, she, or it was entitled to the money that he, she, or it sought from the Government. S. Rep. No. 99-345, at 21 (1986), as reprinted in 1986 U.S.C.A.N. 5266, 5286.

54. The terms "knowing" and "knowingly" used in this Amedned Complaint have the meaning ascribed to them by the FCA. Similarly, the terms "knowledge," "knows" and "knew" are used in this Amended Complaint to have the same meaning.

55. The term "obligation" is defined by the FCA to mean "an established duty, whether or not fixed, arising from an express or implied contractual . . . relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

56. Congress promulgated this definition to reflect its long-held view that an "obligation" under the FCA's reverse FCA provision, 31 U.S.C.

§ 3729(a)(1)(G), encompasses non-fixed and contingent duties to pay or repay monies to the Government. S. Rep. 111-10, 14, 2009 U.S.C.C.A.N. 430, 441.

57.     Under the FCA, "material" means "having a natural tendency to influence, or capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

58.     As noted above, under the FCA, the Government is entitled to recover three times the amount of damages which it sustained because of a defendant's violation of the statute and, for each act by the defendant violating the statute, a civil penalty. For violations that occurred before November 2, 2015, the FCA imposes a penalty for each violation of not less than $5,500 and not more than $11,000. For violations after November 2, 2015, all civil statutory penalties, including the FCA, are subject to an annual adjustment for inflation under Section 701 of the Bipartisan Budget Act of 2015, Public Law 114-74 (No. 2, 2015) ("BBA"). At this time, by operation of the BBA, for all FCA penalties assessed after July 3, 2025, the penalty for each violation is not less than $14,308 and not more than $28,619.

59.     Section 6402(a) of the Patient Protection and Affordable Care Act of 2010 (Enhanced Medicare and Medicaid Program Integrity Provisions), Pub. L. No. 111-148, 124 Stat. 119, 753-56 (2010), amended the Social Securi-

ty Act to specifically address what constitutes an overpayment under the FCA in the context of a federal health care program.

60.     Under this section, an overpayment is defined as "any funds that a person receives or retains under Title XVIII or XIX to which the person, after applicable reconciliation, is not entitled." *See* 42 U.S.C. § 1320a-7k(d)(4)(B). In addition, this provision specifies in relevant part that an "overpayment must be reported and returned" within "60 days after the date on which the overpayment was identified." *Id.* § 1320a-7k(d)(2).

61.     Failure to return any overpayment, such as each claim on which Defendants received an overpayment from Medicaid, constitutes a reverse false claim actionable under section 3729(a)(1)(G) of the False Claims Act.

## IV. FALSITY: THE INFLATED PAYMENT CLAIMS.

### A. Through their Billing Practices, Defendant Hospitals Are Evading Mandatory Coding Rules that Facilitate Required Level-of-Care Reviews by MCOs and Utah Medicaid.

62.     To participate in Utah's Medicaid program, all hospitals, including Defendant Hospitals, are required to enter into contracts with the Utah Medicaid program.

63.     At the same time, with about 79% of Utah's Medicaid-eligible population now covered under the MCO system,[3] hospitals must also enter into separate contracts with each of the MCOs if they wish to be part of the MCO's provider networks, which makes the hospital "in network" for Medicaid recipients covered by that MCO.

64.     To supplement the contracts, MCOs (and Utah Medicaid) also publish "Provider Manuals" containing detailed policy information. For example, key parts of Molina's Provider Manual "are incorporated into the Provider Agreement, and are intended to supplement" those terms. Molina's Medicaid Manual, 1/1/2020 version, p. 75.) The other Utah MCOs also give their providers manuals for similar purposes. (*See, e.g*, Healthy U (University of Utah) Provider Manual ("This provider manual is considered an attachment to, and thereby part of, all executed University of Utah Health Plans Provider Agreements as referenced thereto and incorporated therein."); Select Health Provider Reference Manual at 4 ("The Select Health Provider Reference Manual is intended for use by physicians, ancillary providers, and contracted facili-

---

[3]     https://www.kff.org/medicaid/state-indicator/total-medicaid-mco-enrollment/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last visited Mar. 25, 2026).

ties/vendors as well as their practice managers and office staff" for "education, training, and navigating Select Health policies and procedures for commercial and government plans."); Health Choice Utah Provider Manual at 1 ("The intent of this manual is to furnish contracted providers and their staff with information about Health Choice Utah, covered services, and claim/encounter submission requirements.").)

65.     To ensure that all providers submit their bills using the same standards, Utah Medicaid requires all MCOs and providers—everyone who deals with Medicaid—to adhere to widely used and accepted billing practices, including widely used billing-related codes and associated guidelines. (*See, e.g.*, Utah Medicaid Website ("Effective October 16, 2003, a provider must use applicable data code sets described in the Code of Federal Regulations (162.1002) and as specified in the implementation specifications."), *available at* https://medicaid.utah.gov/hipaa/providers/ (last visited Mar. 25, 2026).) This is a requirement of the Centers for Medicare and Medicaid Services ("CMS") itself.

66.     In particular, Utah's Medicaid program "recognizes guidelines in current editions of established coding manuals or other standard literature" and has adopted them as "consistent with application to Utah Medicaid poli-

24

cy." (Utah Medicaid Provider Manual, General Information, Section I, July 2018, p. 63; *id.* (March 2026) at 122 (same).)

67.    As explained by Utah's Medicaid Provider Manual, "[t]he established coding guidance materials consist of," among others, "Revenue Codes (Uniform Billing Codes-UB-04)." (Utah Medicaid Provider Manual, General Information, Section I, p. 63, Updated July 2018; *id.* (March 20206) at 123 (same); *see also* Utah Medicaid Provider Manual, Hospital Services, Section II, p. 11.)[4]

68.    With respect to revenue codes, the Utah Medicaid Provider Manual explains that "Revenue Codes (Uniform Billing Codes UB-04)" are "a standard data set and format used by the health care community to transmit charge and claim information on hospital services to third party payers. The guidelines are developed on a national basis by the National Uniform Billing Committee." (Utah Medicaid Provider Manual, General Information, Section I, p. 64, Updated July 2018; *id.* (March 2026) at 124 (same)) As explained be-

---

[4] All providers enrolled in the Utah Medicaid Program agree to "[b]e aware of and comply with policies and procedures in the provider manual . . . in effect when the service was rendered." (Utah Provider Agreement for Medicaid (3/1/11 v.) at 3.) They also agree to "comply with all appropriate and applicable state and federal rules and regulations." (*Id.*)

low, UB-04 is a reference to the "Uniform Billing" form used by hospitals to bill Utah Medicaid and MCOs for providing services to Medicaid recipients, including babies in NICUs.

69.      All four MCOs follow suit. For example, Molina's provider manual reiterates that "[p]roviders must follow the appropriate State and CMS Provider billing guidelines," as well as "[o]ther coding guidelines published by industry-recognized resources." (*See, e.g.*, Molina's Medicaid Manual, 1/1/20 version, p. 87.) "Valid revenue [codes], CPT or HCPCS for services or items provided" is "information [that] must be included on every claim," and providers should "reference the NUBC's Official UB-04 Data Specifications Manual" for information about the proper use of revenue codes. (*Id.* at 88, 94.)[5]

---

[5] *See also, e.g.*, Healthy U Provider Manual ("U of U Health Plans follows standard claims processing guidelines . . . ."); Healthy U Provider Manual ("Providers should submit claims via electronic 837 HIPAA-compliant transactions or on the appropriate standard paper forms (CMS 1500 for professional services and UB04 for facility services). . . . All necessary information for correct processing of the claim should be included on or attached to the claim form, including: . . . Procedure codes (CPT/HCPCS) or revenue codes identifying services on claim - obtained from authorized reference guides for the year corresponding to the date of service."); Health Choice Utah Provider Manual at 59 ("The claim form must be completed correctly with valid revenue, procedure, diagnosis codes, and in accordance with [Utah Health Information Network (UHIN)] standards."); Select Health Provider Manual at 12 ("You can send claims electronically through an Electronic Data Interchange (EDI)

70.     Revenue codes are 4-digit numbers, found in the National Uniform Billing Code (NUBC), used to identify which department within the hospital provided the medical services or procedures that are being billed and the types of services provided.

71.     "The *Official UB-04 Data Specifications Manual* [for each particular year], copyrighted by the American Hospital Association, is the only official source of UB-04 billing information adopted by the National Uniform Billing Committee (NUBC). No other publication—governmental or private/commercial—can be considered authoritative. It contains updated specifications for the data elements and codes included on the UB-04 claim form, and used in the electronic HIPAA Institutional 837 Health Care Claim transaction standard." (https://www.nubc.org/subscription-information (last visited Mar. 26, 2026).)

72.     The NUBC defines revenue codes as "[c]odes that identify specific accommodation, ancillary service or unique billing calculations or ar-

---

claims transaction. . . . EDI transactions are sent via a secure connection through the Utah Health Information Network (UHIN)."); UHIN Standards Committee, UB04 Form Locator Elements, Version 3 at 1 ("UHIN Standard UB04 *Form Locator Elements*, is compatible with all HIPAA requirements. It creates a uniform billing method for institutional claims."); *id*. at 3 ("Form Locator 42. Revenue Codes. Must be valid UB04 codes.").

rangements." (National Uniform Billing Committee, Official UB-04 Data Specifications Manual, 2019, Version 13.00, p. 117; *id.* 2025, Version.20.00, p. 121.)

73.      Hospitals use revenue codes to bill for, among other things, the basic cost of caring for patients, like the cost of accommodations at the hospital. These costs not only include bed space but also any specialty equipment and more intensive professional care associated with the patient's stay in the hospital. These are charges for resources that cannot be separately reimbursed with a more specific revenue code. These resources include disposable items like gloves, syringes, wound dressings, and testing equipment; as well as the time that physicians, nurses, and other healthcare workers spend treating the patient. Personal items provided to the patient for use, such as soap, toothbrushes, and diapers, in addition to food sources, are also encompassed in these accommodation charges. Hospitals may only bill their usual and customary charges for these goods and services, and, as alleged below, all hospitals, including Defendant Hospitals, certify in every claim they submit that their billed charges comply with those and other requirements.

74.      As the NUBC explains, "[e]ach service should be assigned a revenue code." (National Uniform Billing Committee, Official UB-04 Data

Specifications Manual, 2019, Version 13.00, p. 118; *id.* 2025, Version 20.00, p. 122.) That is, every item in a hospital's chargemaster, which is the catalog of all services performed by that hospital, must have an associated revenue code.

### 1. Hospitals Submit Claims Using Form UB-04, Which Requires Hospitals to Report Revenue Codes and Associated Charges, Among Other Things.

75. Hospitals submit claims to Utah's Medicaid program, either directly to Utah Medicaid or to the four MCOs, using form UB-04, which is a standard billing form used by Medicare, state Medicaid programs, and private insurance companies. The form requires the hospitals to provide a variety of information and data, often using the standard codes described above. (Use of its electronic equivalent—the 837I submission standards—is more prevalent these days. But whether submitted in paper or electronically, the information is essentially the same.)

76. For example, hospitals report the patient's diagnoses on Form Lines 18 through 28 of form UB-04 using the standard ICD-10 codes. As described below, those reported ICD-10 codes are automatically converted into DRG codes by grouper software. The DRG is then used to determine the standard DRG payment.

77. Hospitals use "Revenue Codes" to identify each separately compensable service they provided to the patient, the number of units of that service (e.g., the number of days the patient stayed in the hospital), and the total charges associated with each revenue code entry.

78. In particular, Form Line 42 ("FL 42") of the UB-04 form (or 837I submission) ("REV. CD.") is where hospitals report the appropriate revenue codes for each of the services that they provide. Hospitals "must enter the appropriate numeric revenue code on the adjacent line in FL 42 to explain each charge in FL 47." (Medicare Claims Processing Manual, Chapter 25, Rev. 3709, 02/03/17, Section 75.4; *see also* Utah Health Information Network (UHIN) Standards Committee, *UB04 Form Locator Elements*, Version 3 at 1 ("The purpose of Standard/Specification UB04 Form Locator Elements, is to clearly describe the use of each form locator in the UB04 (CMS1450) claim billing form and its crosswalk to the HIPAA 837 005010X223A2 Institutional implementation guide."); *id.* at 3 ("Form Locator 42. Revenue Codes. Must be valid UB04 codes.").)

79. On Form Line 46, for each Revenue Code entry, hospitals report the "Service Units." In this case, since the revenue codes apply to hospital accommodations in the NICU, the "Service Units" are simply the number of

days the billed NICU services were provided. (Official UB-04 Data Specifications Manual 2025 at 179 (Form Location 46 is "[a] quantitative measure of services rendered by revenue category to or for the patient to include items such as number of accommodation days . . . . Room & Board accommodations: Units reflect the total number of days of care provided to the patient."); *see also* UHIN Standards Committee, *UB04 Form Locator Elements*, Version 3 at 3 ("Form Locator 46. Service Units").)

80.     UB-04 also requires hospitals to report their charges for the services provided. These billed charges are used to determine the outlier payments, as detailed below.

81.     Form Line 47 is the location on the form where hospitals report the "total charges" for each revenue code entry—that is, the charge for the service by revenue code multiplied by the number of units. (Official UB-04 Data Specifications Manual 2025 at 180; *see also* UHIN Standards Committee, *UB04 Form Locator Elements*, Version 3 at 3.) The total charges should "pertain[ ] to the related revenue code." (Official UB-04 Data Specifications Manual 2025 at 180.)

**2.    The National Uniform Billing Code Mandates That Hospitals Determine the Appropriate Level of Care for NICU Patients Each Day and Then Bill the Appropriate Level of Care Each Day.**

82.     The NUBC provides specific billing guidelines for each revenue code, including for the revenue codes that apply to NICU accommodations. As noted above, the Utah Medicaid program and each MCO require hospitals to follow these guidelines when billing Medicaid.

83.     The NUBC uses four different revenue codes (0171, 0172, 0173, and 0174) for "[a]ccommodation charges for nursing care to newborns and premature infants in nurseries"—i.e., for NICU accommodation charges. (National Uniform Billing Committee, Official UB-04 Data Specifications Manual, 2019, Version 13.00, p. 124; *id.* 2025, Version 20.00, p. 128.)

84.     The NUBC explains that the four revenue codes correspond to different "levels of care" that a NICU may provide to an infant patient. (National Uniform Billing Committee, Official UB-04 Data Specifications Manual, 2019, Version 13.00, p. 124; *id.* 2025, Version 20.00, p. 128.)

85.     As the NUBC explains "[t]he levels of care correlate to the **intensity** of medical care provided to an infant." (National Uniform Billing

32

Committee, Official UB-04 Data Specifications Manual, 2019, Version 13.00, p. 124; *id.* 2025, Version 20.00, p. 128 (emphasis in original).)

86.     The NUBC explains what each of the four levels of care entails, which correspond to the four revenue codes:

> Level I: Routine care of apparently normal full-term or pre-term neonates. (Newborn Nursery*)
>
> Level II: Low birth-weight neonates who are not sick, but require frequent feeding, and neonates who require more hours of nursing than do normal neonates. (Continuing Care*)
>
> Level III: Sick neonates, who do not require intensive care, but require 6-12 hours of nursing each day. ("Intermediate Care"*)
>
> Level IV: Constant nursing and continuous cardio-pulmonary and other support for severely ill infants. (Intensive Care*)

(National Uniform Billing Committee, Official UB-04 Data Specifications Manual, 2019, Version 13.00, p. 124.)

The current manual contains this similar chart:

| Newborn Level of Care | Resource Indications |
|---|---|
| **Level I:** Newborn Nursery | Routine care of apparently normal full-term or pre-term neonates. Provision of care for infants born 35-37 weeks gestational age who remain physiologically stable. |
| **Level II:** Low birth-weight neonates who require frequent feeding and more hours of nursing than do normal full-term neonates. | Provision of care for infants born ≥32 weeks of gestational age and weighing ≥1500g who have physiologic immaturity or who are moderately ill with problems that are expected to resolve rapidly. |
| **Level III:** Intermediate Care | Provision of sustained life support for infants born <32 weeks of gestational age and weighing <1500g. Generally requiring 6–12 hours of nursing care each day. |
| **Level IV:** Intensive Care | Constant nursing and continuous cardiopulmonary and other support for severely ill infants. |

87.     Importantly, the NUBC also states that

> [t]he level of care should be clinically evaluated on a daily basis, typically based on the **resources provided to the infant**. The assigned revenue code corresponds to the level of care determined during the daily evaluation. The levels of care and resulting revenue codes may, and likely will, fluctuate during the infant's stay in the facility.

(National Uniform Billing Committee, Official UB-04 Data Specifications Manual, 2019, Version 13.00, p. 124; *id.* 2025, Version 20.00, p. 128 (emphasis in original).)

88.     In other words, the NUBC mandates that hospitals reevaluate infant NICU patients each day, and, according to that daily assessment, adjust the assigned revenue code based on the resources provided to the infant.

89.     These requirements demonstrate, among other things, that assigning different levels of care is supposed to be meaningful and linked to the resources used by the infant.

90.     Because the different levels of care require different resources from the hospital, almost every hospital charges significantly different rates for each of the different levels of care.

91.     For example, in 2017, the University of Utah Hospital charged $4,004 per day for Level IV care, $3,336 per day for Level III care, $2,736 per day for Level II care, and $952 per day for Level I care.

92.     These differences in the billed daily rates reflect the differences in resources required by each level of care and demonstrate the importance of efforts by MCOs and Medicaid itself to ensure that billed levels of care match the medical records. These claims review and audit processes are intended to

ensure that the medical records reflect that more resources were used to care for an infant, thereby justifying the significantly higher costs.

### 3. Utah Medicaid and MCOs Must Review and Validate the Billed Levels of Care as Part of their Program Integrity Obligations to Medicaid.

93. Utah Medicaid and MCOs must (1) pay only for necessary medical care; (2) adopt program integrity programs, including audits and other claims review processes, to ensure that only medically necessary claims are paid; and (3) calculate and report accurate payment and other claim data to CMS. *See, e.g.*, 42 C.F.R. § 438.608; 42 C.F.R. §§ 455 *et seq.*

94. In particular, payments using Medicaid funds are not permitted for medically unnecessary care or for greater (i.e., more expensive) care than is medically necessary. 42 C.F.R. § 438.608; 42 C.F.R. § 440.230 (State Medicaid agencies may "place appropriate limits on a service based on such criteria as medical necessity"); Utah Admin. Rule R414-1-2(15) (defining "Medically necessary service" as one where "there is no other equally effective course of treatment available or suitable for the recipient requesting the service that is . . . substantially less costly"); 42 C.F.R. § 455.2 (labeling "provider practices that are inconsistent with sound fiscal, business, or medical practices, and result in an unnecessary cost to the Medicaid program" as "abuse").

95.       Utah Medicaid and the MCOs inform providers of these restrictions. (*See, e.g.*, Utah Medicaid Provider Manual (March 2026) (defining "Medical Necessity" the same as the administrative rule); Molina Utah 2020 Medicaid Provider Manual at 39 ("Molina only reimburses for services that are medically necessary. Medical necessity review may take place prospectively, as part of the inpatient admission notification/concurrent review, or retrospectively. To determine medical necessity, in conjunction with independent professional medical judgment, Molina uses nationally recognized evidence based guidelines, third party guidelines, CMS guidelines, state guidelines, guidelines from recognized professional societies, and advice from authoritative review articles and textbooks.")[6]

---

[6] *See also, e.g.*, Select Health Provider Manual at 25 ("Medical necessity provides the most appropriate supply or level of service known to be effective and takes into consideration potential benefits and harms to the patient. . . . The standard definition of 'Medical Necessity/Medically Necessary' includes that the service is "[c]linically appropriate in terms of type, frequency, extent, site, and duration."); Healthy U Provider Manual ("Medically Necessary or Medical Necessity means treatment, services, medicines, or supplies that are necessary and appropriate for the diagnosis or treatment of a Covered Person's illness, injury, or medical condition according to accepted standards of medical practice[, including is] . . . [n]ot more costly than an alternative service or sequence of services or supply,and at least as likely to produce equivalent therapeutic or diagnostic results . . . ."); Health Choice Utah Provider Manual at 4 (definition of "Medically Necessary" includes that "there is no

96.      Utah Medicaid and MCOs are required by regulation and contract to implement programs to detect and prevent providers from billing them for inappropriate care. 42 U.S.C. § 1396a(30) (requiring all Medicaid State Plans "provide such methods and procedures relating to the utilization of, and the payment for, care and . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care"); 42 C.F.R. § 438.608; 42 C.F.R. § 455.12–14. These program integrity requirements must be designed to ensure providers "comply with all applicable requirements and standards under the contract, and all applicable Federal and State requirements." 42 C.F.R. § 438.608(a)(1)(i); Utah Admin Rules R414-2A-10(1) (Utah Medicaid reviews hospital services for "efficient and effective delivery of services" and to make sure "services are appropriate and medically necessary," among others.).

97.      Utah Medicaid and the MCOs must also implement "procedures and a system with dedicated staff for routine internal monitoring and auditing of compliance risks, prompt response to compliance issues as they are

---

other equally effective course of treatment available or suitable for the recipient requesting the service that is more conservative or substantially less costly").

raised, investigation of potential compliance problems as identified in the course of self-evaluation and audits, correction of such problems promptly and thoroughly (or coordination of suspected criminal acts with law enforcement agencies) to reduce the potential for recurrence, and ongoing compliance with the requirements under the contract." 42 C.F.R. § 438.608(a)(1)(vii); 42 C.F.R. §§ 455.500–.518; Utah Provider Manual Section I at 54 ("Federal regulations require the implementation of a statewide surveillance and utilization control program that safeguards against excessive Medicaid payments, and unnecessary or inappropriate utilization of care and services.").

98.     As noted above, these claim reviews and audits can "take place prospectively, as part of the inpatient admission notification/concurrent review, or retrospectively," after a claim is paid. *E.g.*, Molina Utah 2020 Medicaid Provider Manual at 39. Utah Medicaid and the MCOs use "nationally recognized evidence based guidelines" to "determine medical necessity." *Id.*

99.     For example, Molina (1) has a "pre-payment Claims auditing process that identifies frequent correct coding billing errors ensuring that Claims are coded appropriately according to State and Federal coding guidelines," (Molina Healthcare Coding Policy (Rev. 4/12/2021)), and (2) "conducts post-payment reviews of healthcare providers' records related to services

provided to Molina members" to ensure the "most suitable and cost-effective services and supplies" were used and to verify "that the records and documentation substantiate the setting or level of service provided to the patient," (Molina Post Pay General Policy (5/18/2023)).

100.    Molina's pre-payment coding reviews include correct level of care (e.g., revenue codes) and place of service codes. (Molina Healthcare Coding Policy (rev. 4/12/2021).)

101.    Beginning around 2017, Molina began developing a program for ensuring that Molina would only pay for NICU claims based on authorized levels of care. Molina's claims reviewers and others, including Relators, had observed that many NICU claims did not align with the levels of care approved by Molina during the prior authorization process, resulting in overpayments to providers, often very large overpayments.

102.    Eventually, in 2022, Molina formally implemented this policy through Payment Integrity ("PI") Payment Policy 32 (Newborn and NICU), which explains that, fundamentally, "[n]ewborn levels of care are based on the complexity of care provided for an infant with specified diagnoses and symptoms."

103.    Molina's policy provides that Molina or its

designee conducts clinical validation reviews both pre-payment and post-payment. This helps to ensure that claims represent the services provided to our members, and that billing and reimbursement is accurate and compliant with federal and state regulations as well as applicable standards, rules, laws, policy, and contract provisions.

Inpatient admissions may be reviewed in order to ensure that all services are of an appropriate duration and level of care in order to promote optimal health outcomes. . . .

***Reimbursement is independent of the location of care and corresponds to medical treatment and services the neonate requires***. To ensure accurate reimbursement, submitted claims may be reviewed to align preauthorized levels of care and/or clinically validate diagnoses, procedures and other claim information that impact payment. Based on review, the following may occur:

• Down-code revenue codes to authorized levels of care

• Issue a base DRG payment

• Adjust claim diagnoses/procedures that are not substantiated in the medical information provided and apply DRG regrouping

• Request complete medical records and/or itemized statements to support the services on the claim

. . . .

The provider must be able to provide documentation establishing that the criteria for the level of care, revenue code, and/or DRG are satisfied, as submitted on the claim.

(PI MCR Policy 32 Newborn and NICU at 1 (emphasis added).)

104.    Through its NICU level of care alignment efforts, Molina rou-

41

tinely identifies claims with upcoded levels of care, as reported through the revenue codes. Molina's Payment Integrity department has, since initially implementing its program, recovered tens of millions of dollars in upcoded levels of care throughout the country.

105.    By way of representative example, Molina reviewed a NICU claim submitted by the University of Utah Hospital for a baby born on October 15, 2025. Molina's review found that the hospital had billed Level IV (0174) for seven days when the medical records only supported Level III (0173) for those seven days. This correction of the claim resulted in $6,000 in savings to the Utah Medicaid program.

106.    Based on a sample survey of NICU claims that Molina reviewed and corrected for level-of-care issues between 2023 and 2025 across the enterprise, Molina reported an average savings of $18,932 per claim for the Medicaid program.

107.    To reiterate, Molina generally applies the Newborn and NICU policy to hospital providers throughout the country.

108.    But here, Defendant Hospitals' billing practices completely negate the policy, rendering it worthless and unable to accomplish its basic goals. As detailed below, Defendant Hospitals' billing practices, which are difficult to

detect, circumvent this policy, which is itself based on Molina's own obligations to the Medicaid programs.

109.    It is virtually certain that all other MCOs and Utah Medicaid have similar programs and policies to review and audit NICU claims from hospital systems throughout the state, which are being similarly bypassed by Defendant Hospitals' billing practices.

110.    Reviewing and auditing claims—and recouping overpayments to providers when identified through those activities—is critical to the correct computation of each MCO's Medical Loss Ratio ("MLR") and hospital cost reports, as discussed below.

111.    Compliance with the program integrity requirements is a "condition for receiving payment under a Medicaid managed care program." 42 C.F.R. § 438.600(b) (citing § 438.608).

### 4.    Utah Medicaid and the MCOs Have Other Rules Pertaining to Defendant Hospitals Relating to Program Integrity.

112.    In addition to specific rules that require Utah Medicaid and MCOs to verify the billed levels of care based on medical documentation to establish medical necessity, Utah Medicaid and the MCOs have other rules designed to address billing schemes or practices that result in inappropriate or wasteful payments to providers or payments in excess of what the provider

should have received.

113.    For example, Utah Medicaid has a hospital services utilization control and review program to "ensure . . . efficient and effective delivery of services" and that "services are appropriate and medically necessary." Utah Admin. Rules R414-2A-10(1). The program "conduct[s] assessments and audits to ensure the appropriateness and medical necessity of," among others, "[a]dmissions to a hospital or a designated distinct part unit within a hospital." *Id*. R414-2A-10(2).

114.    The Utah Medicaid Provider Manual, whose standards are in addition to any requirements stated in any MCO Provider Manuals that may apply, contains Utah Medicaid's definition of "Medical Necessity," which includes that "there is no equally effective course of treatment available . . . which is . . . substantially less costly." (Utah Medicaid Provider Manual, Section I: General Information, July 2018, p. 14; *id.* (March 2026) at 20 (same) (citing Utah Administrative Rule 414-1-2 (18)).)

115.    The Utah Medicaid Provider Manual also identifies prohibited billing practices, including "any device or strategy that may have the effect of increasing the total amount claimed or paid for any service beyond the maxi-

mum allowable amount payable for such service." (*Id.* (July 2018) at 54; *id.* (March 2026) at 105 (same).)

116. The Utah Medicaid Provider Manual further identifies various forms of provider fraud and abuse that may violate the False Claims Act and similar laws, including "the making of a materially false statement or representation in connection with any claim for payment to the Medicaid program." (*Id.* (July 2018) at 30; *id.* (March 2026) at 54–55 (same).)

117. The Utah Medicaid Provider Manual explains that it is "Provider Abuse" for a provider to engage in any "practices that are inconsistent with sound fiscal, business, or medical practices resulting in unnecessary Medicaid costs." (*Id.* (July 2018) at 15; *id.* (March 2026) at 22 (same).)

118. The MCOs have similar rules and standards. Molina proclaims that it "regards health care fraud, waste and abuse as unacceptable, unlawful and harmful to the provision of quality health care in an efficient and affordable manner." (Molina Utah Medicaid Provider Manual, 1/1/20 at 71.) Molina's Provider Manual, for example, identifies "[a]ltering Claims and/or medical record documentation in order to get a higher level of reimbursement," "[b]illing . . for services to Members that are not Medically Necessary," "[b]illing under an invalid place of service in order to receive or maximize re-

imbursement," and "[f]alse coding in order to receive or maximize reimbursement" as versions of provider fraud. (*Id.* at 73–74.)

119.     Molina should also "validate those elements of Claims are billed in accordance with standardized billing practices" and "ensure that payments reflect the service performed as authorized." (Molina Utah Medicaid Provider Manual, 1/1/20 at 75.)

120.     The other MCOs have similar programs. (*See also, e.g.*, Select Health Provider Manual at 22 ("Audits and reviews of provider claims include, but are not limited to, appropriate coding procedures, . . . retention of medical records and supporting documentation, excessive charges, . . . and any other appropriate reviews."); Healthy U Provider Manual (discussing MCO's fraud program, which includes a "[f]raud detection tool that identifies potential overutilization issues, improper payments, outliers, schemes and suspected FWA," as well as "[u]tilization management reviews - prepayment, concurrent, and postpayment"); Health Choice Utah Provider Manual at 20 (defining "Provider Fraud" as "[p]rovider practices that are inconsistent with sound fiscal, business, or medical practices, and result in unnecessary cost to the Medicaid program . . . ," including "Fraudulent Recoupment Practices" and "Misrepresentation of Services of Supplies.").

**5.   Utah's Medicaid Plan Complies with the Upper Payment Limit Statute and Regulations Through a Diagnosis Related Group ("DRG") Payment System.**

121.   The Medicaid program is jointly financed by the federal and state governments. The states directly pay providers (or MCOs), with the states obtaining the federal share of the payment from accounts that draw on the United States Treasury. 42 C.F.R. §§ 430.0-430.48.

122.   States, like Utah, that choose to participate in Medicaid must submit a state Medicaid plan for approval by the United States Department of Health and Human Services. 42 U.S.C. § 1396a. Once approved, the state may participate in the Medicaid program consistent with federal laws and regulations and the approved state Medicaid plan. *See id.* § 1396b.

123.   Section 1902(a)(13)(A) of the Social Security Act, 42 U.S.C. § 1396a(13)(A), "requires that the State plan provide for payment for hospital and long-term care facility services through the use of rates that . . . are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated facilities to provide services in conformity with State and Federal laws, regulations, and quality and safety standards." 42 C.F.R. § 447.250(a).

124.     The relevant federal statutes also place upper payment limits on the state's plan relating to the payment for hospital facility services. *See generally* 42 U.S.C. § 1396b(i). A state's plan must comply with these upper payment limit requirements. 42 C.F.R. § 447.252(a) ("The plan must provide that the requirements of this subpart[, including 42 C.F.R. § 447.271,] are met.").

125.     Relevant here, federal statutes and regulations provide that no state's Medicaid plan may allow payments for "inpatient hospital services furnished under the plan" that "exceed[] the hospital's customary charges with respect to such services." 42 U.S.C. § 1396b(i)(3); 42 C.F.R. § 447.271 (state Medicaid plan "may not pay a provider more for inpatient hospital services under Medicaid than the provider's customary charges to the general public for the services"); *id*. § 447.250 ("Section 447.271 implements section 1903(i)(3) of the Act, which requires that payments for inpatient hospital services not exceed the hospital's customary charges."); *id*. § 447.252(a).

126.     To comply with these federal requirements, Utah's Medicaid program has prepared a plan that complies with all the federal requirements, which the federal government has approved. (Various amendments to the plan have been made from time to time.)

127.	Utah's Medicaid plan addresses how the state's Medicaid program satisfies the federal requirements limiting payment for inpatient hospital services to "customary charges." *See* State Plan Under Title XIX of the Social Security Act, Medical Assistance Program, Section 4.19, page 57.

128.	Utah's Medicaid plan includes an entire attachment, called Attachment 4.19-A, dedicated to addressing how the state pays for inpatient hospital services and complies with all applicable federal requirements, including the upper payment limit requirement.

129.	Attachment 4.19-A sets out a payment process based on a common payment model in the health care industry known as a Diagnostic Related Group ("DRG") payment system, mentioned previously. The DRG system is also used for federal Medicare claims and by many private health insurance systems for inpatient services. The codes, information, and required data are commonplace and well understood in the industry. Defendant Hospitals submit thousands of claims for inpatient hospital services each year under the DRG system.

130.	Under the DRG system, hospitals are paid a fixed, established amount based on the "average" cost of treating a similar patient with a similar diagnosis. While a hospital may spend more treating a particular patient than

the DRG-established rate, based on the law of averages, the hospital is likely to spend less on other patients. The DRG system recognizes that while some patients will cost hospitals less than the standard payment rate, other patients will cost more, and rather than worry about those discrepancies for particular patients, it is more efficient—and it creates better incentives—to reimburse hospitals based on the average cost of treatment. This system discourages waste and needless spending because hospitals that spend less to treat a patient can retain more of the DRG reimbursement payment as profit.

131. As Utah's Medicaid plan explains,

> DRG weights are established to recognize the relative amount of resources consumed to treat a particular type of patient. The DRG classification scheme assigns each hospital patient to one of over 500 categories or DRGs based on the patient's diagnosis, age and sex, any surgical procedures performed, complicating conditions, and discharge status. Each DRG is assigned a weighting factor which reflects the quantity and type of hospital services generally needed to treat a patient based on the DRG utilized for each case.

Attachment 4.19-A at 3.

132. Utah's Medicaid program then assigns "[p]reset or prospective baseline prices . . . to each DRG" based on this weighting factor. Attachment 4.19-A at 3.

133.    Hospitals do not report DRG codes directly to Medicaid and Medicare, although they can provide their expected DRG (at least to the MCOs) for consideration. As mentioned previously, the diagnoses that are used to determine the DRG are based on codes in the International Statistical Classification of Diseases and Related Health Problems, 10th Revision, more commonly known as ICD-10 codes. During certain periods at issue, the prior 9th version—or the ICD-9 codes—were used.

134.    Providers report these ICD-10 codes to Medicaid in the provider's claims for payment—the same UB-04 claim form where they submit revenue codes. (Again, these days, the information is more commonly transmitted electronically using the 837I protocol, which matches the information on the UB-04.)

135.    Providers report these diagnosis codes in the medical records and claim forms based on the patient's symptoms, history, and other clinical information.

136.    ICD-10 codes are essentially converted into DRG codes by "grouper" software that organizes claims data into episodes of care, usually linked to a diagnosis. Medicare has developed its own software for grouping and converting ICD-10 codes into DRG codes.

137.     Utah's Medicaid program mandates the use of Medicare's "grouper" software for that purpose. Attachment 4.19-A at 6.

138.     Based on the "grouper" software's DRG determination, the standard DRG payment is then made to the hospital. In other words, *the hospital's actual cost of treatment does not enter the equation at any point in the DRG payment process*. The DRG payment is instead determined by the patient's diagnosis and the average cost of caring for that patient at that hospital.

139.     Importantly, Utah's Medicaid systems uses a far greater number and variety of DRGs to define and reimburse NICU patient care. While the standard DRG system divides all NICU cases into one of four DRGs (not to be confused with the four Revenue Code levels, which is a different concept) based on the intensity of the patient's care and with its own assigned base payment corresponding to the care, Utah's Medicaid system uses (or has used) at least twenty-three different DRGs for NICU care. Through this more differentiated and graduated system, Utah's Medicaid system more specifically identifies cases requiring more expensive care and reimburses them accordingly.

140.     For example, while the national DRG system includes code 0790 for the most extreme neonate cases (e.g., extreme immaturity or respiratory distress syndrome), Utah's Medicaid system may convert that code into

one of at least thirteen different Utah-specific codes. While the base payment for claims assigned DRG 0790 was \$23,881.40 when this case was originally filed, the base payments for the Utah-specific DRG codes that convert from DRG 0790 ranged from \$24,829.90 (DRG 8867) to \$248,299.00 (DRG 8861).

141.    In other words, Utah's Medicaid DRG payment system already includes provisions to ensure that hospitals receive reasonable reimbursement for NICU care that complies with federal and state law and policy, including state-specific base DRG payments that often greatly exceed those provided for in the national standard DRG system.

> **a) Utah's DRG Payment System Includes Additional Outlier Payments for Cases that Are Significantly Costlier than the Norm.**

142.    In addition to the foregoing, Utah's Medicaid program also contains a mechanism for hospitals to recover an "outlier enhancement" payment when their billed "charges significantly exceed the base DRG payment rate." Attachment 4.19-A at 3.

143.    Attachment 4.19-A establishes an additional payment for these "outlier" cases:

> In addition to the base DRG payment amount, the DRG system evaluates each claim for a potential outlier payment. *Outlier payments are for those discharges that*

> *have significant variance (based on covered charges) from the norm relative to the base DRG payment amount.*

*Id*. at 3 (emphasis added).

144.     For purposes of this matter, total payments for inpatient services are a function to two payments—(1) the DRG payment, which is a set fee based on the patient's diagnosis, and (2) additional "outlier payments" when the hospital's *billed* charges significantly exceed the DRG rate.

145.     A claim achieves outlier status when the total net covered billed charges exceed the DRG-specific threshold (base DRG payment rate multiplied by the outlier threshold). This threshold is established by Utah's Medicaid program on an annual basis.[7]

146.     When the total net covered billed charges exceed the outlier threshold, the difference is then calculated and multiplied by an outlier adjustment factor, which generates the outlier payment amount. This additional outlier payment is made *in addition to* the base DRG payment amount, and the size of the outlier payment is directly tied to the amount of the billed charges. *The greater the billed charges, the greater the outlier payment.*

---

[7] Utah's Medicaid program establishes outlier thresholds for Utah-specific DRGs as well.

147.     While there is very little a hospital can do to influence the DRG payment, an unscrupulous hospital can obtain millions of dollars in outlier payments by falsely inflating its charges.

148.     That is what Relators have discovered in this case—these three Defendant Hospitals have grossly inflated their room-and-board charges associated with NICU services to enrich themselves at the expense of taxpayers.

**b) Defendants Agreed to be Paid under the DRG Payment System, Promised to Only Bill Their Usual and Customary Charges, and Promised to Comply with Applicable Billing Guidelines.**

149.     To participate in Medicaid, a provider must first enroll in the program. Part of that enrollment process involves signing the standard Provider Agreement. A provider must execute the standard Provider Agreement before he or she is authorized to furnish Medicaid services in Utah. (MCOs are also required, as part of their contracts with the Utah Medicaid program, to ensure that all the providers in their Medicaid networks, including all hospitals, are enrolled with Utah's Medicaid program.)

150.     In their standard Provider Agreements with the Utah Medicaid program, Defendant Hospitals promised to "[s]ubmit claims for services in ac-

cordance with the Medicaid policy in effect at the time of service." (*Id.* at 4 (*see, e.g.*, 3/1/11 version).)

151.    Defendant Hospitals also promised in their Provider Agreements to "[m]aintain all records . . . to fully disclose the extent of services related to billed charges," and the Agreement defines "billed charges" as "[t]he usual and customary charges for the services rendered to the general public." (*Id.* at 1, 4.)

152.    In addition to the explicit promises contained in their Provider Agreements, Defendant Hospitals also agreed to "[b]e aware of and comply with policies and procedures in the provider manual," which is a detailed set of rules given to each Medicaid provider. (*Id.* at 3.) (Periodic updates to the manual are published on the Utah Department of Health's website.)

153.    Indeed, "[e]nrollment as a Medicaid provider is contingent upon the provider satisfying all rules and requirements for provider participation as specified in the applicable Section of th[e] Provider Manual." (Utah Medicaid Provider Manual, Section I: General Information, July 2018, p. 19.)

154.    Utah's Medicaid Provider Manual is divided into two parts: a first "general" part applicable to all Medicaid providers, and a second part that is specific to the type of services offered by the provider. For example, in this

case, the relevant Section 2 of the Provider Manual is titled "Hospital Services." (For example, there are specific second sections for hospice care, pharmacy services, vision care services, and the like.)

155.    Notably, the requirements of the Utah Medicaid Provider Manual are "additional" to any requirements set forth in any applicable MCO Provider Manual. (Utah Medicaid Provider Manual, Section I: General Information, July 2018, p. 10.)

156.    Utah's Medicaid Provider Manual further explains the terms and conditions of the Medicaid Provider Agreement, including the terms relating to billing and charges. (*See* Hospital Services, Utah Medicaid Provider Manual Section 2, pp. 9-11 (referring hospitals to Section 1 of Provider Manual for rules governing billing and coding).)

157.    Section 2 of the Provider Manual specific to hospitals states that "reimbursement for inpatient hospital services is covered in the Utah State Plan," again emphasizing Utah's Medicaid plan as the source of all funding authority. (*Id.*)

158.    With respect to billing practices, the Utah Provider Manual reiterates the promises Defendant Hospitals made in their Provider Agreements. The Provider Manual declares:

The following provisions are part of every Provider Agreement, whether included verbatim or specifically incorporated by reference:

- The provider agrees to comply with all laws, rules, and regulations governing the Medicaid Program.

- The provider agrees that the ***submittal of any claim by or on behalf of the provider will constitute a certification*** (***whether or not such certification is reproduced on the claim form***) that:

    . . .

    - ***The payment claimed does not exceed the provider's usual and customary charges*** . . . , and

- The information submitted in, with, or in support of the claim is true, accurate, and complete.

(Utah Medicaid Provider Manual, Section I: General Information, July 2018, p. 20 (emphasis added); Utah Medicaid Provider Manual, Section I, March 2026, p. 36 (same).)

159.    The Utah Medicaid Provider Manual contains specific rules relating to hospital billing practices. Consistent with the restrictions on billing outlined in many sources of legal authority above, the Provider Manual specifies that a provider's "billed charge may not exceed the usual and customary rate billed to the general public." (*Id.* (July 2018) at 53–54; *id.* (March 2026) at 105 (same).)

160.     The Provider Manual notes that fraud and abuse that may violate the FCA and similar laws includes "charging for th[e provided] services at a rate higher than those charged by the provider to the general public." (*Id.* (July 2018) at 30; *id.* (March 2026) at 54–55 (same).)

### 6.     Until Defendant Hospitals Learned of this Case, Molina Paid Them under the DRG-Plus-Outlier Formula.

161.     As noted above, to become part of an MCO's network, hospitals must also enter into contracts with each of the four MCOs. To that end, on February 5, 2002, the Chief Executive Officer of Ogden Regional Medical Clinic and the designated Coordinator for a no-longer-existing entity called MountainStar (it appears that MountainStar may have become Mountain Division), which at the time operated Defendant Hospitals, entered into an agreement for Defendant Hospitals and others to provide services to Molina's Medicaid-eligible members.

162.     The contract between Molina and Defendant Hospitals has been amended and updated from time to time over the years, including to alter the entity representing Defendant Hospitals and the other now HCA-affiliated hospitals.

163.     On June 24, 2014, Mitch Tibbitts, the Chief Financial Officer for Defendant Mountain Division, Inc., who signed as the "disclosed agent"

59

for Defendant Hospitals and other hospitals in Utah, entered into Amendment No. 19 to the original contract. (The amendment was made effective as of October 1, 2012.)

164. Until that point, Attachment B to Molina's contract with Defendant Hospitals had always contained the payment rates for the hospitals, including Defendant Hospitals. The attachment had been updated from time to time over the years.

165. Effective October 1, 2012, Molina and Defendant Hospitals agreed in Amendment No. 19 that "Covered Inpatient Services shall be paid at an amount equivalent to the maximum allowable DRG rate under the State of Utah Medicaid Fee-For-Service Program fee schedule in effect on the date of discharge." (Amendment No. 19 to Molina-HCA Contract, Attachment B, p. 1.)

166. The Utah Department of Health Bureau of Coverage and Reimbursement Policy publishes the state's Fee-For-Service "fee schedule" each year. In reality, the schedule is a calculator published in Excel format.

167. This calculator implements Attachment 4.19-A to Utah's Medicaid plan. In other words, Attachment B to Molina's contract with Defendant

Hospitals specified the payment system described in Attachment 4.19-A to Utah's Medicaid plan.[8]

168.    On information, Relators allege and believe that Defendant Hospitals have entered into a materially similar contract with at least one other MCO.

169.    As Defendant Hospitals are well aware, the fee calculator uses specific data and information contained in the submitted claims to derive the final total payment—the combination of both the DRG payment and, if applicable, any outlier payment. As alleged above, providers certify, among other things, that their claims and this data and information are accurate and comply with applicable rules, regulations, and statutes.

---

[8] Pursuant to a subsequent amendment to their contract, beginning December 2019, Molina agreed to pay Defendant Hospitals "110% of Medicaid DRG Rates" for NICU cases. Per 42 C.F.R. § 438.8(e)(2)(iii), managed care organizations may make "incentive and bonus payments . . . tied to clearly-defined, objectively measurable, and well-documented clinical or quality improvement standards." To be clear, Relators are not aware of any such standards supporting the additional 10% fee—and Relators are skeptical that the additional 10% payments were legitimate—but that is a separate issue. Under the 2019 version of the contract, HCA's practices *resulted in greater total wrongful payments* since the 10% incentive payment was calculated based on the *already inflated* DRG-plus-outlier payments.

### 7. In This Case, Although Defendant Hospitals Appear to Be Adjusting the Revenue Code Based on the Level of Care, They Billed Medicaid for Lower Levels of Care at Level IV or Greater Prices Since at Least 2011.

170.   From no later than about 2011 until around 2023, while Defendant Hospitals adjusted the level of care/revenue codes for NICU patients, they billed the different levels of care/revenue codes using the *same rate*, negating entirely the point of the level-of-care system and thwarting Utah Medicaid's and the MCOs' ability to ensure that payment reflects the intensity of care, as the NUBC requires.

171.   From approximately 2011 to 2020, Defendant Hospitals billed Utah's Medicaid program at what were effectively Level IV rates (or even greater) for Level II and Level III care. Defendant Hospitals billed Level II, III, and IV care at the same, very high, rate.

172.   Subsequent to the filing of this case, in approximately 2020, two Defendant Hospitals (St. Mark's and Timpanogos) began billing their Level II rates differently but continued to bill Level III and Level IV care at the same rate—what amounted to Level IV (or even greater) rates. Around that time, it appears that Ogden Regional ceased the practice altogether, which is

further evidence that Defendant Hospitals knew how to bill correctly but chose not to.

173.    Defendant Hospitals have exploited a loophole in UB-04 (and its electronic counterpart), which does not require the Hospitals to report their daily room-and-board prices and allows them to hide the fact they are billing Medicaid for lower level care at Level IV-like prices.

174.    Defendant Hospitals' acts went undetected for years because nothing in the claims submission process required Defendant Hospitals to state the daily rate they charge for Level II, Level III, and Level IV care. Rather, the UB-04 only requires Defendant Hospitals to report the "total charges" per revenue code, which, for these revenue codes, is the daily rate multiplied by the number of days.

175.    Unless a claims reviewer takes the time to calculate the daily rate charged by the hospitals from the billed total charges, as Relators did while implementing the original NICU level of care review program at Molina, it is easy for Defendant Hospitals' billing practices to escape detection.

176.    As detailed below, Defendant Hospitals admitted, in response to Relators and others' original findings, that their practices were in error, but they continued to bill Utah's Medicaid program using the inflated costs for

many years. (Eventually, in 2023, Defendant Hospitals used their economic leverage over Molina to negotiate an even more sweetheart deal, which is described below.)

177.    These acts have resulted in Defendant Hospitals receiving tens of millions of dollars in Medicaid payments that they were not entitled to receive.

178.    Relators have identified and compiled hundreds of examples of Defendant Hospitals billing Medicaid for lower-level care at Level IV-like prices. Based on a preliminary analysis of such claims, as described further below, between 2015 and 2018 alone, Defendant Hospitals have obtained more than $7 million in outlier NICU payments from just a single MCO (Molina) that they would not have received had they not inflated their charges. This does not account for the practices before and after these dates or the claims submitted to other MCOs or to Utah Medicaid directly.

179.    Relators have identified examples at least as far back as 2011 (though the practices likely began earlier), and as late as late 2023.

180.    Below is a small sample of representative example NICU claims that Defendant Hospitals submitted to Medicaid with inflated charges.

### a) Example 1: St. Mark's

181.    On February 26, 2018, Defendant St. Mark's began caring for a patient (Claim No. *******3239) in its NICU. St. Mark's billed Utah's Medicaid system for twenty-six (26) days of NICU care at a Level IV revenue code at a daily rate of $5,279.00. (Billed charges of $137,254 for 26 days = $5,279 per day.) St. Mark's also billed Utah's Medicaid system for thirty-five (35) days of Level III care at a daily rate of $5,279.00. (Billed charges of $184,765 for 35 days = $5,279 per day.) St. Mark's then billed Utah's Medicaid system for thirty-seven (37) days of Level II care at a daily rate of $5,279. (Billed charges of $195,323 for 37 days = $5,279.) Defendant St. Mark's received an outlier payment that exceeded the base DRG payment by more than 200%, which outlier payment alone totaled more than a quarter million dollars. Every dollar St. Mark's billed under each of the revenue codes increased the outlier payment.

182.    On July 20, 2017, Defendant St. Mark's began caring for a patient (Claim No. ********0221) in its NICU. St. Mark's billed Utah's Medicaid system for two (2) days of NICU care at a Level IV revenue code at a daily rate of $4,799.00. (Billed charges of $9,598 for 2 days = $4,799 per day.) St. Mark's also billed Utah's Medicaid system for thirty-eight (38) days of Level III care at a daily rate of $4,799.00. (Billed charges of $182,362 for 38 days =

$4,799 per day.) St. Mark's then billed Utah's Medicaid system for twenty-eight (28) days of Level II care at a daily rate of $4,799.00. (Billed charges of $134,372 for 28 days = $4,799.) Defendant St. Mark's received an outlier payment that exceeded the base DRG payment, which outlier payment alone totaled more than $80,000. Every dollar St. Mark's billed under each of the revenue codes increased the outlier payment.

183.    On January 9, 2016, Defendant St. Mark's began caring for a patient (Claim No. *******2854/*******9708A1) in its NICU. St. Mark's billed Utah's Medicaid system for eighteen (18) days of NICU care at a Level III revenue code at a daily rate of $4,363.00. (Billed charges of $78,534 for 18 days = $4,363 per day.) St. Mark's also billed Utah's Medicaid system for twenty-two (22) days of Level II care at a daily rate of $4,363.00. (Billed charges of $95,986 for 22 days = $4,363 per day.)

184.    On July 17, 2019, St. Mark's had a baby born that required NICU services. St. Mark's billed Utah Medicaid (through Molina) for Level III

and Level IV care at the same daily rate of $5,701.00 per day. (Claim #*******9988)[9]

185.     On January 14, 2020, St. Mark's began caring for a baby born in its hospital that required NICU services. St. Mark's billed Utah Medicaid (through Molina) for Level III and Level IV care at the same rate of $8,723.00 per day. (Claim # *******2927A1)

186.     On April 17, 2021, St. Mark's started caring for a baby born in its facility who needed NICU care. St. Mark's billed Utah Medicaid (through Molina) for Level III and Level IV care at the same daily rate of $10,031.00. (Claim #*******9838A1)

187.     On February 6, 2022, St. Mark's began caring for a baby born in its facility who needed NICU care. St. Mark's billed Utah Medicaid (through Molina) for Level III and Level IV care at the same daily rate of $11,029.00. (Claim #*******8973A1)

188.     On September 7, 2023, St. Mark's started caring for a baby born in its facility who needed NICU care. St. Mark's billed Utah Medicaid

---

[9] For the sake of brevity, Relators have omitted the number of days Defendant Hospitals billed the separate rates for the example claims added since the original Complaint. But if the Court is interested in such information, it is available.

(through Molina) for Level III and Level IV care at the same daily rate of $13,103.00. (Claim #*******9573A1)

### b) Example 2:    Ogden Regional

189.    On March 28, 2018, Defendant Ogden Regional began caring for a patient (Claim No. *******6062) in its NICU. Ogden Regional billed Utah's Medicaid system for fifty-three (53) days of NICU care at a Level IV revenue code at a daily rate of $4,501.00. (Billed charges of $238,553 for 53 days = $4,501 per day.) Ogden Regional also billed Utah's Medicaid system for twenty-one (21) days of Level III care at a daily rate of $4,501.00. (Billed charges of $94,521 for 21 days = $4,501 per day.) Ogden Regional further billed Utah's Medicaid system twenty-two (22) days of Level II care at a daily rate of $4,501.00. (Billed charges of $99,022 for 22 days = $4,501 per day.) Defendant Ogden Regional was originally set to receive an outlier payment that exceeded the base DRG payment, which outlier payment alone would have totaled more than $190,000. After Molina conducted a further itemized bill review, the total charges allowed were reduced in other areas. Such adjustments did not, however, alleviate the revenue code billing practices, which continued to affect the claim. Ultimately, Ogden Regional received a DRG payment of $81,938.67 and an outlier payment of $45,843.72 (before a Utah-required

Budget Adjustment Factor that applied to final payments at the time). Every dollar that Ogden Regional billed under each of the revenue codes increased the outlier payment.

190.    On January 19, 2017, Ogden Regional began caring for a patient (Claim No. *******1443) in its NICU. Ogden Regional billed Utah's Medicaid system for seven (7) days of NICU care at a Level IV revenue code at a daily rate of $4,168.00. (Billed charges of $29,176 for 7 days = $4,168 per day.) Ogden Regional also billed Utah's Medicaid system for forty-three (43) days of Level III care at a daily rate of $4,168.00. (Billed charges of $179,224 for 43 days = $4,168 per day.) Ogden Regional then billed Utah's Medicaid system nine (9) days of Level II care at a daily rate of $4,168.00. (Billed charges of $35,512 for 9 days = $4,168 per day.) Defendant Ogden Regional received an outlier payment for this claim.[10]

191.    On September 10, 2017, Defendant Ogden Regional began caring for a patient (Claim No. *******1407) in its NICU. Ogden Regional billed

---

[10] Due to a clerical error, Molina ultimately underpaid this claim to Ogden Regional. Ogden Regional could have appealed the underpayment but did not, likely due to administrative oversight. Ogden Regional still received an outlier payment on this claim that was calculated based on the hospital's fraudulent charges.

Utah's Medicaid system for one 1 day of NICU care at a Level IV revenue code at a daily rate of $4,168.00. Ogden Regional also billed Utah's Medicaid system for seventeen (17) days of Level III care at a daily rate of $4,168.00. (Billed charges of $70,856 for 17 days = $4,168 per day.) Ogden Regional further billed Utah's Medicaid system seven (7) days of Level II care at a daily rate of $4,168.00. (Billed charges of $29,176 for 7 days = $4,168 per day.) Defendant Ogden Regional received an outlier payment for this claim that was more than ten times its base DRG payment. Every dollar Ogden Regional billed under each of the revenue codes increased the outlier payment.

192.    On February 27, 2016, Ogden Regional began caring for a patient (Claim No. *******5467) in its NICU. Ogden Regional billed Utah's Medicaid system for seven (7) days of NICU care at a Level IV revenue code at a daily rate of $3,789.00. (Billed charges of $26,523 for 7 days = $3,789 per day.) Ogden Regional also billed Utah's Medicaid system for five (5) days of Level III care at a daily rate of $3,789.00. (Billed charges of $18,945 for 5 days = $3,789 per day.) Ogden Regional then billed Utah's Medicaid system nine

(9) days of Level II care at a daily rate of $3,789.00. (Billed charges of $7,578 for 2 days = $3,789 per day.)[11]

### c) Example 3: Timpanogos

193.    On May 23, 2018, Defendant Timpanogos began caring for a patient (Claim No. *******0503) in its NICU. Timpanogos billed Utah's Medicaid system for seven (7) days of NICU care for at a Level III revenue code at a daily rate of $5,350.00. (Billed charges of $37,450 for 2 days = $5,350 per day.) Timpanogos also billed Utah's Medicaid system for thirty-seven (37) days of Level II care at a daily rate of $5,350.00. (Billed charges of $197,950 for 37 days = $5,350 per day.)  Defendant Timpanogos received an outlier payment that about matched the base DRG payment, which outlier payment alone totaled more than fifty thousand dollars ($50,000). Every dollar Timpanogos billed under each of the revenue codes increased the outlier payment.

194.    On July 31, 2017, Defendant Timpanogos began caring for a patient (Claim No. ********9267) in its NICU. Timpanogos billed Utah's Medicaid system for three (3) days of NICU care at a Level III revenue code at a daily rate of $4,954.00. (Billed charges of $14,862 for 3 days = $4,954 per

---

[11] This claim was ultimately denied pending Molina's request for medical records. The claim was paid under an adjusted claim number.

day.) Timpanogos also billed Utah's Medicaid system for thirty-six (36) days of Level II care at a daily rate of $4,954.00. (Billed charges of $178,344 for 36 days = $4,954 per day.) Defendant Timpanogos received an outlier payment for this claim.

195.    On April 11, 2016, Defendant Timpanogos began caring for a patient (Claim No. *******1564) in its NICU. Timpanogos billed Utah's Medicaid system for one day of NICU care at a Level III revenue code at a daily rate of $4,504.00. Timpanogos also billed Utah's Medicaid system for five (5) days of Level II care at a daily rate of $4,504.00. (Billed charges of $22,520 for 5 days = $4,504 per day.) Defendant Timpanogos received a substantial outlier payment for this claim that was more than double its base DRG payment.

196.    On September 2, 2020, Timpanogos started caring for a baby born in its facility who needed NICU care. Timpanogos billed Utah Medicaid (through Molina) for Level III and Level IV care at the same daily rate of $9,946.00 per day. (Claim #*******7685)

197.    On August 30, 2021, Timpanogos began caring for a baby born in its facility who needed NICU care. Timpanogos billed Utah Medicaid (through Molina) for Level III and Level IV care at the same daily rate of $11,140.00. (Claim #*******8404A1)

198.    On November 19, 2021, Timpanogos started caring for a baby born in its facility who needed NICU care. Timpanogos billed Utah Medicaid (through Molina) for Level III and Level IV care at the same daily rate of $12,254.00. (Claim #*******0186A2)

199.    On May 4, 2022, Timpanogos began caring for a baby born in its facility who needed NICU care. Timpanogos billed Utah Medicaid (through Molina) for Level III and Level IV care at the same dialy rate of $12,254.00. (Claim #*******4085A1)

200.    On February 14, 2023, Timpanogos started caring for a baby born in its facility who needed NICU care. Timpanogos billed Utah Medicaid (through Molina) for Level III and Level IV care at the same daily rate of $13,480.00. (Claim #*******0049A2)

201.    Attached as Exhibit 1 is a list of claims, identified by claim number, that Defendant Hospitals submitted between January 2015 and March 2018 in which Defendant Hospitals inflated their charges in the same manner alleged above.

202.    These are only representative examples. There are many other claims that Defendant Hospitals submitted, both to MCOs and directly to Utah Medicaid, that involved the same type of billing practices.

**B.**    **After learning of the existence of the allegations in this case, Defendant Hospitals used their economic leverage over Molina to coerce Molina into a payment scheme that (1) continues the overpayments to Defendant Hospitals and (2) attempts to evade the DRG payment system altogether.**

**1.**    **Initially, Molina tries to get Defendant Hospitals to Comply with Their Obligations.**

203.    In their original 2002 contract, Molina and Defendant Hospitals agreed that "Medically Necessary" includes, as part of the definition, that a service is "the most appropriate . . . level of service which can be safely provided to the Enrollee in least costly setting," which is a common understanding of the term.

204.    They also emphasized, through an attachment to the contract (Attachment D), that NICU levels of care were supposed to be meaningful. The attachment specified the greater levels of personal service and care that each infant must receive to be classified at the higher levels of care.

205.    And as it does with other hospital providers with less economic leverage, Molina initially attempted to apply its standard NICU level-of-care policies to Defendant Hospitals' NICU claims and internally recognized the importance of doing so.

206.    During one of these routine reviews in December 2017, Relator Nelson found several examples of Defendant Ogden Regional billing the

74

same rates for Levels of Care II, III, and IV. She brought this to the attention of her supervisor, Dayne Moss, who forwarded the issue to Molina's then Director of Provider Services, Rachele Bridgman, on December 12, 2017. As Ms. Bridgman noted in an email on December 13, 2017, "if this goes into outlier under DRG payment that would be a concern because potentially their billed charges are higher than they should be." Ms. Bridgman also forwarded the issue to Kelli Carpenter in Molina's Compliance department.

207.    At around that same time, representatives of Molina began discussions with representatives of Defendant Hospitals about how their NICU billing practices did not comply with the applicable rules and regulations.

208.    Defendant Hospitals' representatives informed Molina's representatives during these discussions that the Hospitals billed the other Utah Medicaid MCOs in the same way.

209.    On March 29, 2018, Willie Stevens, Molina's then Director of HealthCare Services, and all three Relators met internally to discuss Molina's NICU payment policies. According to meeting minutes, the group concluded that Molina "need[ed] to pay what we authorized and pay on what we think should be billed," which is precisely an MCO's role. *See generally* 42 C.F.R. § 438.608.

210. It was also reported during that meeting that "Brandon [Hendrickson, the then President of Molina Healthcare of Utah and Idaho,] is recognizing that [HCA] is billing the same amount for each level of care[. T]hey are now thinking about taking payment back. [Molina] has about 300 appeals that may fall within this category."

211. On May 7, 2018, Relator Stanyon emailed Rachelle Lopez, Molina's then Director of Provider Contracting, Willie Stevens, Relator Brown, Relator Nelson, and others within Molina, asking "what the status is with HCA and their billing practice for NICU claims." She wanted to know whether Molina had "formally notified them that going forward they cannot continue to do this?"

212. After several communications between representatives of Molina and Defendant Hospitals, a telephone conference involving Willie Stevens, Relators, other Molina representatives, and several representatives of Defendants was arranged on June 1, 2018. In particular, representatives of Defendant HCA's Shared Business Center at HCA's headquarters in Nashville, Tennessee, participated in the conversation (Patrick Puertolas and Sherry Chapman). Additionally, Aimee Whetman, Vice President of Payer Contract-

ing and Alignment for HCA's Mountain Division, participated in the call, along with several other representatives of Defendant Hospitals and HCA.

213.     One of two items on the agenda for that meeting was Defendant Hospitals' practices of billing NICU Levels of Care II (revenue code 0172), III (0173), and IV (0174) at the same rate, which had the known and obvious effect of pushing the claims into outlier status almost immediately, even for care of relatively healthy infants.

214.     During the call, an HCA Division Director, Michelle Covington, acknowledged that Molina representatives had raised objections about Defendant Hospitals failing to perform "level of care billing for the different levels of NICU" services and how, for example, "a revenue code 173 is billed at the same amount as a level ... as a rev code 172." (Transcript of June 1, 2018, Telephone Conference at 27:53–28:47 ("Rev code" being short for "revenue code."))

215.     Ms. Covington asserted during the call that one of the "benefits seen to" Defendant Hospitals from billing the same rate for different levels of care was "the elimination of [certain] types of denials" from Defendant Hospitals also failing to bill the correct level of service, which, as noted above, is the very Molina claim review program that kicked off the issue. (*Id.*)

216.    Ms. Covington, in other words, admitted that Defendant Hospitals' practice of billing the same rate for different levels of care was to evade Molina's important NICU level-of-care review program, which Molina, and likely every other MCO and Utah Medicaid, performs (still) on nearly all NICU claims. By billing the same rate for every level of care, Defendant Hospitals believed they should be permitted to avoid Molina's level-of-care review program since, in HCA's view, doing so no longer mattered.

217.    Ms. Covington, in fact, suggested that if Defendant Hospitals bill the "same amount" for Level III as Level II, "when you look at outlier cases . . . , why would it make a difference if . . . the bill is the same"? (*Id.*)

218.    But Molina's representatives, Carrie Matson and Willie Stevens, explained that such practices had a large effect on the payments Defendant Hospitals would receive (and had been receiving) from Medicaid. Ms. Matson immediately corrected Ms. Covington, telling her, "If you're in outlier, they don't pay the same though." (June 1, 2018 Tr. at 28:48–28:52, 28:57–29:03.)

219.    After a brief interruption, Ms. Matson continued, "Right, and each level pays different. None are grouped together like that." (*Id.*) Defendant

Hospitals were thus specifically told that their billing practices were abnormal and unlike other hospitals' billing practices.

220.    In response to HCA Vice President of Payer Contracting and Alignment for Mountain Division Aimee Whetman's misunderstanding that Defendant Hospitals were "paid on the DRG," Ms. Matson and Mr. Stevens explained the entire problem in clear, unmistakable terms:

> Ms. Matson:  . . . *No, we're talking about outlier, and many of these babies go to outlier*. And when it's in outlier, . . . the Claims Department looks at the level of care slash rev code that we approved. . . .
>
> Mr. Stevens: Because *what it does*, Aimee, *is it kicks kids into outliers a lot quicker when you're billing $5200 and, in reality, they're only a level two baby, and the total billed charges should be at a lower amount*. So, *it's forcing us* [i.e., Molina as Medicaid's agent], if we were to pay them all, *to pay a lot higher outlier dollars, even though the level of care doesn't match that*. So, the level-of-care amount billed should match with the intensity of services that the baby is receiving and not just be in the same number thrown across the board for Level II, III, or IV.

(June 1, 2018 Tr. at 29:04–30:09 (emphasis added).)

221.    Molina directed HCA's representatives to work on "changes [HCA] can make . . . so that levels of care match up with the bill." (June 1, 2018 Tr. at 31:18–32:25.)

222.     Molina representatives also stressed the importance of using and billing the appropriate NICU levels of care to Defendant Hospitals' management. As Relator Nelson and Ms. Matson explained during that call, the use of different NICU levels of care originated from the American Academy of Pediatrics and is required by CMS:

> Ms. Nelson:  . . . And those recommendations [for the different NICU levels of care] are also followed through with the American Academy of Pediatrics recommendations [interruption] for billing.
>
> Ms. Matson: Yes...
>
> Ms. Nelson: and also the UB 04 billing guidelines that CMS requires the use of. So those are all written out in . . . in that where the revenue codes match that InterQual[12] level of care.
>
> Ms. Matson: Yep.

(June 1, 2018 Tr. at 35:54–36:18.)

223.     After the June meeting, Brandon Hendrickson, Molina's Utah and Idaho Plan President, "recommended that [Molina's Appeals & Grievances Department] send a few cases to . . . compliance to submit to the OIG for

---

[12] InterQual is a widely consulted "evidence-based clinical decision support solution for payers, providers and government agencies helps ensure clinically appropriate medical utilization decisions," which is offered by Optum. *See* https://business.optum.com/en/operations-technology/clinical-decision-support/interqual.html (last visited Mar. 29, 2026).

review." Relator Nelson was tasked with providing the information to Molina's Compliance Department. As she explained to Nalani Namauu in Molina's Compliance Office in an email on June 27, 2018,

> [b]y them billing the same rate for every level, they are violating their contract because they are not billing 'industry standard billing rules'[.] The description of what should compromise [sic] a revenue code rate is in the NUBC guidelines (which CMS requires health plans to use). A revenue code rate should be different for every patient and likely every day. HCA is billing at a higher rate that [sic] everyone else, as well as billing the same rate for every NICU level- this increases their calculated payments with [sic] the claim is paid and can move them to a higher payment reimbursement via outliers.

(Email from S. Nelson to N. Namauu, June 26, 2018.)

### 2. HCA Admits Knowing that Its Billing Practices Are Causing High Rates of Outlier Payments.

224.    On December 10, 2018, HCA representatives and Molina representatives, including Relators, held another call to discuss the NICU billing issue. The HCA representatives on the call included Ms. Covington and Mr. Puertolas, who both participated in the June 1, 2018, telephone conference.

225.    Yet again, Molina representatives confronted HCA representatives over their improper NICU billing practices:

> Mary Yeager, Molina Prior Authorizations Department:
>
> And then we also have issues with all levels no matter what the level being billed at the same price. So, if it's a higher [revenue code] level, generally it would be a higher cost. But if it's a lower [revenue code] level, you would see a decrease in the billed amount. But we're seeing the same prices in all, and we're seeing levels that don't meet being billed as well. So, you're going into outliers very quickly. . . .

(Transcript of December 10, 2018, Telephone Conference at 7:10–8:04.)

226.    Ms. Yeager explained to Defendant Hospitals' senior management how the system should work:

> The payment amount would be based on the levels meeting [the clinical records]. So, if the claim comes in, and there's a 40-day stay, and 30 of those days are at a Level IV, and that's what you billed, and that's what we reviewed and it met, then we pay those 30 days. But if the remainder are Level I or Level II, and you're still billing a Level IV, we're not going to pay those until those are corrected.

(Dec. 10, 2018 Tr. at 8:36–9:02.)

227.    On behalf of Defendant Hospitals, Mr. Puertolas conceded that for most claims, "the payment should be DRG" only. (*Id.* at 9:31–9:53.)

228.    But Molina representatives were quick to point out that Defendant Hospitals were, in fact, receiving far more than the DRG payment on most NICU claims. As Relator Stanyon explained, "almost all of the NICU

82

claims are going into outlier status." Ms. Covington, for Defendant Hospitals, acknowledged that Ms. Stanyon was "Right." (*Id.* at 11:00–11:13.)

229.    Indeed, Ms. Covington, who had access to "outlier status figures" and had been receiving regular reports about the NICU claims, agreed that "like [Molina] said, most everything is hitting outlier." (Dec. 10, 2018 Tr. at 11:24–11:44.)

230.    Relator Hali Stanyon explicitly notified Defendant Hospitals' representatives during that call that the "reason as to why a lot of the claims are going into outlier status is because all of those revenue codes for the different levels are being billed at the same rate." (Dec. 10, 2018 Tr. at 12:06–12:46.)

231.    Ms. Stanyon also inquired of Defendant Hospitals during the call whether they were still claiming that the billing practices were the result of an "IT load error" and, if so, whether "that IT load error has been fixed and we'll be seeing a change in that any time soon?" (*Id.*)

232.    HCA's Division Director, Ms. Covington, represented during the December 10 call that "the reason behind" that billing practice was that HCA's corporate contracting department "decided to go to a blended rate. So they took all of the NICU level care of cares and averaged them out and then just applied that individual rate." (Dec. 10, 2018 Tr. at 12:48–14:20.)

233. But, of course, billing a "blended rate" is *not* billing a rate that is commensurate with the level of service provided, is *not* the "usual and customary" rate, and is *not* permitted when its express purposes is to evade standard NICU level-of-care reviews and obtain outlier payments.

234. Moreover, Defendant HCA's supposed "blended rate" exceeded the rates that almost all other Utah hospitals billed for the highest level of care—Level IV care. In other words, HCA's supposed "blended rate"—if that is really what it was—was just a disguised Level IV rate.

235. As noted above, in 2017, Defendant St. Mark's billed Utah Medicaid $4,799.00 for Level II, III, and IV care, while the University of Utah charged only $4,004.29 for Level IV care, $3,336.15 for Level III care, and $2,736.12 for Level II care.

236. The next year, in 2018, Defendant St Mark's charged $5,279.00 for Level II, III, and IV care, while University of Utah charged just $4,083.09 for Level IV, $3,450.53 for Level III, and $2,829.90 for Level II.

237. In 2017, Defendant Timpanogos, which is a less specialized hospital and handles fewer Level IV patients, charged $4,954.00 for both Level II and III care. Meanwhile, Jordan Valley Medical Center, with comparable

NICU services in a similar area, charged $2,098.50 for Level III care and only $1,606.60 for Level II care.

238.    Likewise, in 2018, while Defendant Timpanogos was charging $5,350.00 for Level II and III care, Jordan Valley did not increase its rates at all, charging Utah Medicaid just $2,098.50 for Level III care and $1,606.60 for Level II care.[13]

239.    Moreover, whatever the explanation for their billing practices, by December 2018, Defendant HCA and Defendant Hospitals acknowledged that these practices violated the applicable rules and regulations and needed to be changed.

240.    During the December 10 call, HCA's Division Director, Ms. Covington, also admitted that Defendant Hospitals

> are looking forward to a corporate *solution to our level-of-care mismatch*. And it really-*it really has a lot to do with our internal processes*. And we're hopeful that we'll have that rolled out in our division [i.e., the

---

[13] Defendants St. Mark's and Timpanogos's NICU rates remain well above their peers, even today. According to now publicly available data, the University of Utah Hospital currently charges $4,817,90 for Level IV care, Primary Children's Hospital charges $11,435.15 for Level IV, and the Intermountain Medical Center charges $8,324.61 for Level IV. By contrast, Defendant St. Mark's currently charges $14,151.00 for Level IV (and Level III), while Defendant Timpanogos charges $15,723.00 for Level IV (and Level III).

Mountain Division] here in April [2019], but I just don't think it's going to come any faster than that. And I do believe that those, that *there is something within that corporate solution that addresses those differences in levels of care charges*. I just don't know the specifics of that yet . . . .

(Dec. 10, 2018 Tr. at 12:48–14:20 (emphasis added).)

241.    When pressed about the supposedly forthcoming solution, Ms. Covington admitted that the problem was nationwide within HCA:

. . . *I'm talking about HCA corporate. So nationwide* [interruption]*, we're having this same issue with level of care*. And so, they have a solution for us that will *fix our internal problem*, but they're rolling it out to the largest NICUs first and unfortunately, here in the Mountain Division, we don't have the largest NICUs in the company, so we have to wait until the first part of next year.

(Dec. 10, 2018 Tr. at 14:32–15:00 (emphasis added).) Mr. Puertolas agreed with Ms. Covington's assessment, noting that "hopefully, we'll [i.e., Defendant Hospitals will] have a long-term solution sooner rather than later." (*Id.* at 16:02–16:20.)

242.    Despite promises that the "problem" billing practices would be "fix[ed]" by April 2019, Defendant Hospitals continued to bill Utah's Medicaid program in the same way. Notwithstanding HCA's acknowledgment in December 2018 that its "internal processes" were generating a "level of care

mismatch," Defendant Hospitals not only failed to address the substantial overpayments they had received over the years due to this practice, they continued to bill Utah's Medicaid program using the same billing practices.

### 3. For a Time, Molina Continues to Convince Defendant Hospitals to Comply with Their Obligations.

243. For a while, Molina continued to try to get Defendant Hospitals to comply with their obligations. In mid-January 2020, Molina convened one of the first meeting of a new internal "NICU DRG Workgroup," which included Marc Habib, Molina's then national Assistant Vice President over Process Improvement and Operational Excellence, Dr. Cynthia Rossi, Molina's then Medical Director for Molina Healthcare Services, Relator Shannon Nelson, and many other senior Molina management employees.

244. The group discussed how Molina's implementation of level-of-care reviews, which started in Utah, had been expanded to other states. During that meeting, Ms. Nelson discussed with the group how "HCA bills at really high rates of care, so almost all of their claims come in, with even a one or two day length of stay where it's a normal nursery level billed at 795. And it's already in outlier. . . . So, it's really billed charges and it depends on the facility." Elina Onitskansky, Molina's then Senior Vice President over Strategy, acknowledged the point. (Transcript of January 16, 2020 Meeting at 8:51–

9:27.)

245.    During a related meeting on February 21, 2020, between Dr. Rossi and Relator Nelson, the two discussed the status of Molina's NICU claims review program and how the program addressed an important "compliance issue with Medicare and Medicaid." (Transcript of February 21, 2020 Meeting at 18:30–18:545.)

246.    Relator Nelson, Roman Podkorytov, Molina's National Assistant Vice President over Strategy, and others worked to refine Molina's NICU claims review program to include consideration of the rates charged by hospitals for each NICU level of care. For example, during a meeting on March 5, 2020, Relator Nelson discussed including in new reports information about "rate for Level I, rate for Level II, rate for Level III. . . . You know, from the service line for each revenue code." She made this recommendation so it would be easier for Molina personnel to compare the different rates and determine whether they are the same or similar when the claim had gone into outlier payment status. (Transcript of March 5, 2020 Meeting at 36:17–36:42.)

247.    Mr. Podkorytov had earlier conceded that, "[h]onestly, outliers is a big topic, not only in NICUs, but overall in our [i.e., Molina's] DRGs." (*Id.* at 24:38–25:32.)

248.     Discussions around these issues continued within Molina, as Molina further refined its NICU claims review process to include DRG and level-of-care review processes.

249.     For example, during an internal Molina call on May 12, 2021, involving Dr. Rossi, Dr. Elena Comrov, a Medical Director for Molina, and Relator Nelson, the team met to discuss modifying the claims review process, both internally and by third-party vendors. As they discussed, the way it is supposed to work is that, "of course, [the hospitals are] going to bill more for Level IV than they do a Level III, [and] based on the DRG and the state's out-lier limit, the billed charges will roll into that DRG." (Transcript of May 12, 2021 Meeting at 7:39–9:09.)

250.     The next day, on May 13, 2021, Dr. Rossi and Relator Nelson met with a larger group, including Girish Dugapati, a member of Molina's Payment Integrity Analytics team, and several others, to make recommendations to Jeannie Koontz, Molina's then Assistant Vice President over Payment Integrity, regarding changes to Molina's NICU claims review program. After a lengthy discussion of the areas of concern, Mr. Dugapati asked the group to "rank" the issues in order of importance. Relator Nelson offered this response, both foreshadowing later events and reinforcing the importance of the NICU

level-of-care reviews for outlier claims:

> So, I would say, like first and foremost, the contract would be the biggest thing because there's contracts that are configured to pay on a per diem rate, and so they may pay $5100 per day *and level of care and DRG don't matter*. So, it would really have to start with Contracts [Department], number one. And then if the contract is paid on DRG, number two would be that it's a clinically validated DRG. Number three would be . . . a level of care review and, really, like a line-by-line audit, so looking at pharmacy, and level of care. And then if we wanted to go deeper, actually doing a line by line, that could be done at that point, but . . . but three and four really are only if the claim will go into outliers based on the clinically validated DRG.

(Transcript of May 13, 2021 Meeting at 14:39–15:35 (emphasis added); *see also* Transcript of May 21, 2021 Meeting at 12:02–15:30 (Dr. Rossi to group of Molina management: "When you're looking at outlier [NICU claims], then all three things actually impact payment. So, the DRG being clinically correct, the severity . . . , and the leveling then does really come into play."); *id.* at 1:18:23–1:19:01 (Dr. Rossi noted that implementing similar processes for Molina's Utah health plan "had a big impact for Utah" in terms of reducing overpayments).)

251.    During another meeting a few days later between Dr. Rossi and Relator Nelson, the two reviewed a report of Molina's outlier claims for

Medicaid between 2018, 2019, 2020, and the first part of 2021. As Relator Nelson remarked, "[t]here's a ton for Medicaid." After asking for report to be limited to only 2020 and part of 2021, Dr. Rossi remarked, in astonishment, "look at all these outliers." (Transcript of May 18, 2021 Meeting at 35:49–37:54.)

### 4. After Defendant Hospitals Learned of this Lawsuit, Defendant Hospitals' Parent Company Pressures Molina to Hide the Overpayments. Because Molina Is Dependent on Defendant Hospitals to Operate in Utah (and Other States), It Relents.

252.    Over the next few years, Relators moved to new roles within Molina or temporarily left Molina's employment, and they were personally less directly involved in the NICU review issues. But given their new roles, some also had access to new sources of information about the problem. And Molina management continued to consult them about the issues, particularly Relator Nelson and Relator Stanyon.

253.    Defendant Hospitals learned about the existence of this lawsuit and the essential allegations from the Government's investigation of the case while the case was pending under seal. (The case was originally filed in 2019.) It is evident that Defendant Hospitals' knowledge of these proceedings kickstarted an effort to coerce Molina into changing the parties' Medicaid contract so that Defendant Hospitals continued to receive essentially the same pay-

ments—including the overpayments—but through a system that would avoid scrutiny and detection.

### a) Defendant Hospitals Exert Tremendous Economic Power Over Molina and Use It to Extract Concessions That Violate Both Parties Obligations to Government Programs.

254.    Relators learned that Defendant HCA was exerting pressure on Molina to allow the overpayments from Molina's managerial employees. HCA was reportedly pressuring Molina to "paper over" the issue by changing the entire method of payment to a per diem method Molina management earlier acknowledged would be contrary to both Molina's and Defendant Hospitals' obligations to the Medicaid program.

255.    To participate in managed Medicaid programs, MCOs must maintain "network adequacy"—that is, they must have contracts with a sufficient number of providers to ensure that their beneficiaries have reasonable access to the healthcare the MCOs are being paid to provide. MCOs must meet certain benchmarks demonstrating that their beneficiaries have access to enough providers with reasonable waiting times, among other considerations, which MCOs ultimately satisfy by contracting with providers, such as Defendant Hospitals. Any MCO that cannot demonstrate network adequacy is ineligible for a contract to cover Medicaid beneficiaries in that state. *See* 42 C.F.R.

§ 438.207(a); *see also* 42 C.F.R. § 438.68 (requiring State Medicaid Programs to develop network adequacy standards).

256.    Hospitals, like Defendant Hospitals, who are "members of a multifacility system that dominates a geographic market[,] can . . . exert significant market power" in their interactions with MCOs. A Practical Guide to Reimbursement in Managed Care at 111.

257.    HCA specializes in gaining such leverage. In fact, HCA is known to dominate the local markets in which its hospitals operate. As of 2023, "HCA [held] the most or second-most inpatient market share in about 80% of its markets."[14]

258.    Accordingly, Molina has tremendous financial and operational incentives to maintain its contractual relationships with its larger network hospitals, particularly those, like Defendant Hospitals, who operate numerous facilities and dominate their respective geographic markets. Sometimes this includes giving these dominant market providers concessions that Molina does not give to other providers, including concessions that are contrary to both

---

[14] "HCA outlines plans to expand market share by 2030," Healthcare Dive, Nov. 10, 2023, *available at* https://www.healthcaredive.com/news/hca-investor-day-expanding-market-share-2030/699463/ (last visited Jan. 7, 2026).

Molina's and Defendant Hospitals' obligations to the Medicaid program.

259.    Molina has no right to provide these concessions to HCA or Defendant Hospitals, and Molina's coerced "allowance" of these practices in no way immunizes HCA's and Defendant Hospitals' own responsibility to bill and report claims correctly and to refrain from using their economic power to cajole MCOs into allowing anything other than billing and reporting claims correctly.

**b) Defendant Hospitals Demand Molina Switch to a Per Diem System at Rates That (i) Are Calculated Based on Prior Overpayments, and (ii) Are Much Greater Than the "General Public" Rates Both Molina and Defendant Hospitals Have Agreed on in Other Contracts.**

260.    Relators first learned of Defendant Hospitals' coerced agreement with Molina a few months before it was finalized.

261.    Dr. Rossi emailed Relators Nelson and Stanyon on September 28, 2023, noting that Relator Nelson had earlier told her that "a 'blended rate' to encompass LOC [level of care] for HCA was not a good idea," and asking them to provide "any information that I can pass on" to those apparently negotiating a contract amendment.

262.    As Relator Nelson explained in an email the same day, "this defeats the purpose of NICU levels of care. Each LOC is assigned a different

94

rate based on staffing, resource needs, intensity of services provided. With a blended rate, you would be overpaying for level 2 care and [potentially] underpaying for level 4 care. There are many more level 2 stays than level 4."

263.    She also provided the definition of "Medically necessary service" from the Utah Administrative Code (cited above), including the provision that "there is no equally effective course of treatment available or suitable . . . that is . . . substantially less costly." As Relator Nelson pointed out, "[a] less costly service would be paying at the level 2 rate if the member meets that NICU level clinically, and not a blended rate that equates to level 3 or higher."

264.    Relator Stanyon also responded the next day to add that "[i]t also violates National Uniform Billing Guidelines for billing Nursery Revenue Codes." Relator Stanyon also included a screenshot of the relevant NUBC guidelines, with this part highlighted: "Notes: The levels of care correlate to the intensity of medical care provided to an infant . . . ."

265.    Willie Stevens made two important admissions in response to this information, which Dr. Rossi provided to him. First, he admitted that "[if] we decide to negotiate a blended rate, *we would take all of the over/under payments made for those levels in our historical run rate to ensure that we come to a cost*

*neutral rate*." (Email from W. Stevens to C. Rossi, et al., Oct. 3, 2023.) This is an important admission, because notwithstanding Mr. Stevens' lip service about "underpayments," there were—and had been—only systematic over-payments associated with HCA's prior level-of-care billing practices. And according to Mr. Stevens, the forthcoming blended rate for Medicaid claims would take into account all those overpayments in setting the so-called "blended rates" so they were "cost neutral."

266.    Since the "historical run rate" included substantial "over . . . payments," the "cost neutral" "blended rates" developed from it continued to perpetuate those overpayments in every new claim submitted under the new rates.

267.    Mr. Stevens also let slip the true reason Molina was agreeing to this new arrangement: to "remove all the provider abrasion/appeals we are dealing with at this time." (*Id.*) "Provider abrasion" is a euphemism for complaints from providers, usually associated with claims review, auditing, and program integrity activities. In the email, Mr. Stevens admitted that the reason Molina was considering giving HCA a blended rate with overpayments baked in is because HCA was complaining. (This complaining seemed to have started shortly after Defendant Hospitals and HCA learned about the allegations in

this lawsuit.)

268.     Notably, these new terms are contrary to Molina's management's statements in internal meetings about Molina's NICU claims review program: "I definitely don't think, like, loosening that, or not doing that review or not doing the concurrent [review], and coding it right, like that—I don't think that's the right way to go." (Transcript of May 17, 2021 Meeting at 19:10–20:37; *id.* at 22:07-22:28 (Girish Dugapati:"Recognize that the outlier review is the first thing to look at."); *id.* at 30:11–30:34 (Joji Thumma, Molina's then Vice President of Payment Integrity, discussing how these reviews are necessary to determine "where we are making overpayment.").)

269.     A few months later, on February 1, 2024, new contract rates were adopted by Defendant Hospitals and Molina. As Diane McWilliams, Provider Contracts Manager for Molina's Utah plan, explained in an email, "[t]he intent is to pay the per diem regardless of the NICU level of care authorized." (Email from D. McWilliams to C. Rossi, et al, June 25, 2024.)

270.     Dr. Rossi, having been part of the earlier discussions about the importance of Molina reviewing NICU claims, responded with seeming exasperation: "[s]o if payment is the same, why would we exert effort (which for NICU is a lot) to do any level of care review? Not sure why [Molina would re-

view claims for level of care] in this situation." (Email from C. Rossi to D. McWilliams, et al, June 25, 2024.)

271.    Dr. Rossi also asked the critical question that Molina, as the steward of taxpayers' Medicaid funds should always ask itself before agreeing to something a provider is asking: "[W]hat plans are in place to ensure that this blended daily rate is producing savings?" (*Id.*)

272.    James Heldt, then Molina's Assistant Vice President for Network Strategy and Services, who apparently approved (or was involved in approving) the change, not only side-stepped Dr. Rossi's question about the change producing "savings" (because it would not), he also displayed total ignorance about how the change would derail an important claims review program years in the making.

273.    Relator Stanyon had to explain to Molina's Contract Department what they had just done: "[t]he Payment methodology agreed to in this contract negates any ability or reason to perform a level of care review for these facilities. Even if there are discrepancies for a LOC on a single date of service the rate billed and subsequent rate paid would not change." (Email from H. Stanyon to J. Heldt, et al, July 3, 2024.

274.    In response, Mr. Heldt admitted he must "have misunder-

stood/not fully understood" what the effect would be, which is an understatement. (Email from J. Heldt to H. Stanyon, et al, July 3, 2024.)

275.    In her June 25 email, Ms. McWilliams included screenshots of the per diem rates for both Molina's Medicaid contract with Defendant Hospitals, and its rates for Molina's Affordable Care Act ("ACA") Marketplace contract with Defendant Hospitals.

**ATTACHMENT B**
**COMPENSATION SCHEDULE – MEDICAID**

Mountain Division - Molina Healthcare of Utah Medicaid Rate Sheet Effective 02/01/2024 for all facilities. Rate to be paid on services and care per Table 1 that are tied to Medicaid, will utilize the Utah Medicaid rate in effect on the date of service.

In the event Facility Billed Charges are less than the rates set forth in this Attachment, Facility shall be paid Billed Charges. All Professional Services are EXCLUDED from the below rate structures.

| Table 1: Facility Specific Services Rate Table | (1) All Other Inpatient Services | (2) Rehab | (3) Emergency Room Services | (4) Outpatient Surgery | (5) Outpatient Observation Services | (6) All Other Outpatient Services | (7) Vaginal Delivery Cases | (8) C-Section Delivery Cases | (9) Normal Newborn Case Rate | (10) All Other Maternity Services Not Already Specified | (11) NICU I-IV Blended Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|
| All Other participating Facility's included in Attachment D | 100.5% of Utah Medicaid DRG Rates | 100% of Utah Medicaid DRG Rates | $420 Per Case | 100% of Utah Medicaid | 100 % of Utah Medicaid | 100% of Utah Medicaid | $4,975 for Two Days with $1,000 Per Diem Outlier | $8,500 for Three Days with $1,000 Per Diem Outlier | $2,300 for Two Days with $1,000 Per Diem Outlier | 100% of Utah Medicaid DRG Rates | $3,625 Per Diem |

| Molina Rate Sheet - Utah | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| HIX | | | | | | | |
| Services are defined by the designated codes (marked with "X") listed below. Inpatient is based on current year CMS MSDRG. Claims are paid at lesser of claim billed charges or rates defined below. | | | | | | Rates Brigham City, Lake view, Mountain View, Cache Valley, Ogden Regional, St. Marks, Timpanogos, Lone Peak | |
| Service Description | Payment Description | MS-DRG | Rev Code | CPT/HCPC | Payment Information | Rates Effective 10/1/2023 | Rates Effective 4/1/2024 |
| Inpatient Structure | | | | | | | |
| ALL OTHER INPATIENT | Rates will be paid at applicable rates defined. All applicable pass through items will be paid in addition to these rates. | | | | | | |
| NICU | Per Diem | 789-794 | | | Per Diem | $1,132 | $1,158 |
| Normal Newborn | Per Diem | 795 | | | Per Diem | $0 | $0 |
| Psych/Chemical Dependency | Per Diem | 876, 880, 887, 894, 897 | | | Per Diem | $1,223 | $1,260 |
| Inpatient | Case rate – Paying at MS-DRG v41 Weight based on Base Rate | CMS MS-DRG v41 | | | Update Fee Schedule at time of renewal and upon mutual consent | $7,697 | $7,875 |
| All Other Unlisted DRG | Any MSDRG billed on a claim not listed above is payable at Percent of Charge | | | | % of BC | 33.4% | 33.4% |

276.     Mr. Heldt later clarified in an email that the ACA Marketplace rates had been in place since April 1, 2020, four years before the contract for Medicaid was revised to include them.

277.     ***Critically, the rates are vastly different***. Molina agreed to pay a $3,625 per diem rate[15] for Medicaid claims from Defendant Hospitals based on "historical" "overpayments," but Molina agreed to only pay about $1,132 per day for the ACA Marketplace claims. In other words, Molina and Defendant Hospitals have agreed to a rate for Medicaid claims that is *three times greater* than the rate for claims from the ACA Marketplace open to the general public.

---

[15] The per diem rate also covers Level I care, which is billed far more often than any other level of care by a wide margin. HCA's per diem rate is multiple times what other hospitals charge for Level I care.

278.     ACA Marketplace plans are open to almost all U.S. citizens and nationals. Although subsidies are available for some enrollees based primarily on financial considerations, anyone without a health plan (e.g., not covered by an employer-sponsored plan) can enroll in an ACA Marketplace plan.

279.     By contrast, Medicaid eligibility is tightly controlled for only the most needy.

280.     Accordingly, Defendant Hospitals have demanded—and Molina has agreed—to pay rates for Medicaid patients that are grossly disproportionate to those paid by the general public.

281.     And to be clear, the babies born to mothers enrolled in ACA Marketplace plans are not systematically healthier, thereby justifying such different rates from a risk standpoint.

C.     **Rate Arbitrage Helps Both Molina and Defendant Hospitals Increase Profits at the Expense of the Medicaid Program.**

282.     Instead, what appears to be happening is classic rate arbitrage.

283.     MCOs do not receive money from Utah Medicaid for each claim they pay to a provider, such as Defendant Hospitals. Instead, Utah Medicaid pays a capitation fee (*i.e.*, a per-patient per-month fee) to the MCO. The capitation fee is loosely analogous to an insurance premium.

284.     MCOs, such as Molina, must submit certain information about their medical care costs and related data to be used in "developing the capitation rates." 42 C.F.R. §§ 438.5(b)(5), (c).[16]

285.     Under federal law, Utah Medicaid must determine each MCO's capitation rate using actuarially sound methods. 42 C.F.R. § 438.4. Those methods must involve use of "base utilization and price data," "trend factors, including cost and utilization," the "MCO's . . . past medical loss ratio" ("MLR"), and "the projected medical loss ratio." 42 C.F.R. § 438.5(b); 80 Fed. Reg. 31098, 31107 (June 1, 2015) ("We believe that MLR calculation and reporting are important tools to ensure that capitation rates set for Medicaid managed care programs are actuarially sound and adequately based on reasonable expenditures on covered medical services for enrollees.").

286.     To satisfy CMS's requirement that all capitation rates be "actuarially sound," "capitation rates must . . . [b]e developed in such a way that

---

[16] The Utah Office of Inspector General has recognized that federal regulations make "it clear that CMS requires complete and accurate encounter data, [Utah Medicaid] must verify and ensure completeness and accuracy[,] and CMS may deny or delay the federal match for capitation payments relative to the encounter records found incomplete or inaccurate." Utah OIG, Audit of the Medicaid Encounter Data Quality Assurance at 16 (2018-01); *id.* at 18 ("[I]ncomplete datasets for encounters . . . diminishes accuracy of [the capitation] rate determination.").

the MCO . . . would reasonably achieve a medical loss ratio standard, as calculated under § 438.8, of at least 85 percent for the rate year." 42 C.F.R. § 438.4.

287.    Because the medical loss ratio is at the foundation of setting capitation rates for MCOs, federal regulations specify precisely how that ratio must be determined. 42 C.F.R. § 438.8.

288.    An MCO's MLR is generally determined by comparing the MCO's expenditures on medical claims to its revenues: the MLR estimates the proportion of the capitation payments (and other income) the MCO has spent caring for patients in a given year. The numerator primarily consists of "the sum of the MCO's . . . incurred claims" during the prior year. *Id*. § 438.8(e).

289.    But "[a]mounts that *must be deducted* from incurred claims include . . . [o]verpayment recoveries received from network providers." *Id*. § 438.8(e)(2)(ii) (emphasis added). And "MCOs . . . must attest to the accuracy of the calculation of the MLR" in accordance with federal regulations. *Id*. § 438.8(n).

290.    Because these crucial calculations rely so heavily on the payment and other data from providers, CMS has specifically warned State Medicaid programs that "[c]laims and billing fraud may be perpetrated by either providers or subcontractors who manipulate the claims submitted to the

MCO," which the MCO then extends by "submitting false encounter claims to the State or purchasers of health care in the hope that future capitation payments will be based on inflated service records." CMS Guidelines for Addressing Fraud and Abuse in Medicaid Managed Care at 23.

291.    In particular, CMS has identified "[p]roviders submit[ting] inflated reports of . . . treatment costs" as an example of billing fraud that can be initially perpetrated by the provider but then get transmitted to CMS by the MCOs and State Medicaid programs. *Id.* at 25.

292.    As noted above, CMS requires that Utah Medicaid, "through its contract with the MCO, . . . *must* require that the MCO . . . implement and maintain arrangements and procedures that are designed to detect and prevent fraud, waste, and abuse." 42 C.F.R. § 438.608 (emphasis added).

293.    These procedures must include, at a minimum, "a method to verify, by sampling or other methods, whether services that have been represented to have been delivered by network providers" were received as represented, as well as the recovery of any identified overpayments. *Id.*[17]

---

[17] As CMS has explained to State Medicaid Programs,

> [f]or **capitation rate setting**, states should *verify provider payment amounts* and diagnosis codes to ensure that

294.     The "[c]ontracts with a MCO . . . *must* specify," among others, "treatment of recoveries of all overpayments from the MCO . . . to a provider" and the "process, timeframes, and documentation requirement for" reporting and repaying the overpayments to Utah Medicaid. *Id.* (emphasis added).

295.     As noted above, Utah Medicaid "*must* use the results of the information and documentation collected [from provider overpayments recovered by MCOs] for setting actuarially sound capitation rates for each MCO . . . consistent with the requirements in § 438.4." 42 C.F.R. § 438.608 (emphasis added).[18]

---

> capitation rates are adequate to cover the cost of the services in the contract and to support accurate risk adjustment.

State Toolkit for Validating and Auditing Medicaid Managed Care Encounter Data at 7 (Aug. 2019) (italics added), *available at* https://www.medicaid.gov/medicaid/downloads/ed-validationtoolkit.pdf. (Note: this toolkit was updated in 2023, but the relevant parts remain the same.)

[18] As CMS explained,

> [b]ecause these overpayments represent state and federal Medicaid funds that were paid to the excluded or fraudulent providers by the MCO, . . . states are then expected to take such recoveries into account in the development of future actuarially sound capitation rate . . . . This approach is similar to that taken by CMS in addressing provider recoveries in the MA

296.     This, of course, makes sense. Unless overpayments are excluded from the MLR calculation, MCOs have little incentive to pursue and report providers for overpayments, especially where such providers are vital to the MCO's network adequacy requirements, as Defendant Hospitals are for Molina in Utah.

297.     MCOs will "hope that future capitation payments will be based on" the incorrect MLR so they can recoup the overpayments made to providers, and the providers are more than happy to retain payments they did not earn and are not entitled to receive. *See, e.g.*, CMS Guidelines for Addressing Fraud and Abuse in Medicaid Managed Care at 23. The fraudulent billing practices wash through the payment system, corrupting the actuarial soundness of the capitation rates and distorting the final payments—both to MCOs and providers—from what they should be.

298.     Mallory Hooks, Molina's Assistant Vice President of Payment Integrity, recently acknowledged that Jeremy Bamford, Molina's Senior Vice

> [Medicare Advantage] program; in that program, encounter data that reflects services paid to excluded providers or other variations of provider fraud are excluded from consideration for future rate development.

80 Fed. Reg. 31098, 31131 (June 1, 2015).

President of Payment Integrity, had conceded that Medicaid programs adjust Molina's capitation payments "based on amount paid." (Microsoft Teams Message from M. Hooks to S. Crane, Molina's Director of Payment Integrity – DRG Coding and Validation, March 2, 2026.)

299.    That said, even if the MCO does not know about the overpayments and submits the inflated payment data unwittingly, the Utah Medicaid program suffers the same effects. The intent or knowledge (or not) of the MCO is irrelevant to how these billing practices affect the capitation rate payments.

300.    Empirical evidence suggests that Molina is extremely lenient with its network providers in Utah. For NICU care, Defendant Hospitals are Molina's primary providers. Yet, in its June 2022 Utah Focused Program Integrity Review, "CMS [wa]s concerned with the quantity and quality of Utah's ACOs' [aka MCOs'] investigations of fraud, waste, and abuse" of network providers. CMS, Utah Program Integrity Review at 6 (June 2022).

301.    In particular, addressing directly the issues here, CMS concluded that

> **[o]verall, the amount of overpayments identified and recovered by . . . Molina . . . appears to be exceedingly low for a managed care program of Utah's**

**size**. Further, . . . the state must obtain a clear accounting of any recoupments for these dollars to be accounted for in the annual rate-setting process. (§ 438.608(d)(4)) *Without these adjustments, ACOs* [aka MCOs] *could be receiving inflated rates per member per month* [aka capitation rates].

*Id*. at 9 (italics added).

302.    Molina has allowed Defendant Hospitals to bypass all regular NICU claims review programs and processes and paid Defendant Hospitals a rate that continues their "historical" "overpayments," which is a rate more than three times greater than the rate charged to the general public under comparable ACA Marketplace plans.

303.    Since Molina's Medicaid capitation rates are based, at least in part, on Molina's claimed medical claim expenditures, as Jeremy Bamford recently acknowledged, but Molina's expenditures in the ACA Marketplace do not result in the same Government-derived benefits, Molina and Defendant Hospitals have conspired to shift costs *from* the ACA Marketplace program *to* Utah's Medicaid program. This is classic rate arbitrage, perpetrated at the expense of taxpayers.

304.    The upshot is that Defendant Hospitals leveraged their market power in Utah to coerce Molina into giving them more favorable contractual terms for their Medicaid NICU payments. Molina agreed to an expensive

blended rate and stopped enforcing well-established distinctions between different levels of care. Because these rates were developed based on historical payments to HCA, including overpayments, every claim paid under the rates is itself an overpayment. To be revenue neutral to the Medicaid program, the blended rates—if they are that—would have to developed based on the payments HCA *should have* received, without the inflated charges. Molina had no authority to knowingly permit such overpayments to Defendant Hospitals, but went along anyway to appease Defendant Hospitals—whom Molina needs to operated in Utah—and also because the overpayments inflate the amounts Molina can subsequently claim in capitation payments from the Government.

305.    Additionally, on information, Relators believe and allege that at least some Defendant Hospitals continue to bill other (non-Molina) MCOs and Utah Medicaid directly for both Level III (0173) and Level IV (0174) care at rates that exceed every other hospital's Level IV rates. It appears Defendant Hospitals could still be receiving substantial outlier payments from other MCOs or from Utah Medicaid directly. These costs are also passed through to the Medicaid program in a similar way.

**D.     Statements and Claims: Defendants Have Submitted Numerous False Claims for Payment and Certifications of Compliance to Utah's Medicaid Program and CMS.**

306.    Defendant Hospitals make several express and implied statements regarding the information they submit to Medicaid, including a number of statements relating to their billed charges.

**1.     Defendant Hospitals Expressly Represent Their Billed Charges on Form UB-04 Comply with Applicable Requirements.**

307.    Utah's Provider Manual for Hospital Services mandates that hospitals use form UB-04 (or its electronic equivalent) for inpatient medical claims, as do the MCOs' Provider Manuals and other guidance documents.

308.    By submitting claims using form UB-04 (or the electronic 837I version), hospitals make several specific certifications about the information they are submitting in the claim forms.

309.    In particular, all hospitals, including Defendant Hospitals, agree that "[s]ubmission of this claim *constitutes certification* that the *billing* information as shown on the face hereof is *true, accurate and complete*." (UB-04 Standard Certifications.)

310.    Defendant Hospitals further certify when they submit every UB-04 "[t]hat the submitter did not knowingly or recklessly disregard or mis-

represent or conceal material facts" relating to the information contained in the claim form. (UB-04 Standard Certifications.)

311.    While the certifications stated above apply to all government healthcare programs, the standard UB-04 certifications also include statements specific to different Government aid programs. Relevant here, the standard UB-04 certifications provide:

> For Medicaid purposes: The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws.

(UB-04 Standard Certifications.)

312.    Defendant Hospitals submitted hundreds (or more likely, thousands) of claims to Utah's Medicaid program that included these certifications about their billing practices that were, for the reasons explained above, false.

### 2.    False Claims Submitted to MCOs are Independently Actionable Under the False Claims Act.

313.    Courts have consistently held that a provider's claims to an MCO (or Medicare Advantage plan, the Medicare equivalent) are actionable under the FCA. For example, in *United States ex rel. Marti-no-Fleming v. South*

*Bay Mental Health Center, Inc.*, the court rejected "[d]efendants argu[ment] that the claims involving MCOs . . . fail[ed] because these government contractors are paid on a capitated basis" because "'claim' is defined by statute to include claims of payment of government funds made to government contractors." 2018 WL 4539684, at *7 (D. Mass. Sept. 21, 2018); *see* 31 U.S.C. § 3729(b)(2). Accordingly, the court found the relator's allegations that a hospital "submitted false claims and made false statements to Medicaid contractors [i.e., MCOs] who paid the bills with Medicaid funds as a result" were sufficient under the False Claims Act. *Id.*; *see also, e.g., United States ex rel. Arik v. DVH Hosp. All., LLC*, No. 219CV01560, 2022 WL 980285, at *4 (D. Nev. Mar. 31, 2022) (holding that claims submitted by providers to Medicare Advantage plans can be actionable under the False Claims Act); *United States ex rel. SW Challenger, LLC v. EviCore Healthcare MSI, LLC*, No. 19 CIV. 2501, 2021 WL 3620427, at *9 (S.D.N.Y. Aug. 13, 2021) (noting that "[f]raudulent claims are actionable not only when they are presented to an 'of-ficer' or 'employee' of the United States, but also when they are presented . . . to a 'contractor, grantee, or other recipient'"); *United States v. Visiting Nurse Serv. of N.Y.*, No. 14-5739, 2017 WL 5515860, at *12 (S.D.N.Y. Sept. 26, 2017) (same); *United States ex rel. Simpson v. Bayer Corp.*, 376 F. Supp. 3d 392, 411 (D.N.J. 2019) (collecting cases).

314.     The U.S. Department of Justice has taken the same position in several cases. For example, in its July 2023 Statement of Interest (ECF 40) in *United States ex rel. Thomas v. Mercy Care, Touchstone Behavioral Health* (D. Ariz. 22-cv-00512), the DOJ "clarif[ied] that liability under the FCA could . . . be based ***solely*** on a false claim or false statement made by Touchstone Behavioral Health ('Touchstone') [i.e., the provider] to Mercy Care [i.e., the MCO], ***or*** by Mercy Care to Arizona's Medicaid agency, the Arizona Health Care Cost Containment System ('AHCCCS'))." SOI, ECF No. 40 at 2 (emphasis added). The DOJ continued,

> Mercy Care, as a managed care organization, has contracted with AHCCCS to provide services to Medicaid recipients. The funds that Mercy Care receives from AHCCCS—and that Mercy Care subsequently pays to Touchstone—are federally subsidized, whether through Medicaid or through federal grants managed by AHCCCS. Just as a subcontractor may face FCA liability if it submits false claims to a general contractor that has a contract with the United States, so Touchstone may face FCA liability if it submits false claims to Mercy Care that result in payment of funds provided in whole or in part by the federal government. . . . Both the text of 31 U.S.C. § 3729(b)(2)(A)(ii) and [the Fraud Enforcement and Recovery Act of 2009]'s legislative history make it evident that it is not necessary to plead the direct submission of false claims to the government in order to state an FCA claim.

*Id.* at 3 (footnote omitted).

### 3. By Submitting Claims, Defendant Hospitals Impliedly Certify that the Claims Comply with Applicable Rules, Regulations, and Contract Requirements.

315.    As alleged above, the Utah Medicaid Provider Manual, which all providers, including Defendant Hospitals, must comply with under their Provider Agreements, sets forth several important certifications that providers are deemed to have made by submitting claims to the Utah Medicaid program.

316.    In particular, every provider, including Defendant Hospitals, agrees that "the submittal of any claim by or on behalf of the provider will constitute a certification (whether or not such certification is reproduced on the claim form)" that, among other things, that "[t]he payment claimed does not exceed the provider's usual and customary charges." (Utah Medicaid Provider Manual, Section I: General Information, July 2018, p. 20 (emphasis added).)

317.    Additionally, the Provider Manual adds that every claim submission "constitute[s] a certification" that the "information submitted in, with, or in support of the claim is true, accurate, and complete." (*Id.*)

318.    As alleged above, each of the Provider Manuals of the MCOs contains similar warnings about the accuracy of claims submitted by providers.

319.     Defendant Hospitals have submitted hundreds (or more likely, thousands) of claims impliedly certifying that their billing practices complied with these restrictions and limits that did not, in fact, comply.

### 4.   Defendant Hospitals' Annual Cost Reports Contain Further Certifications of Compliance with Medicaid and Other Applicable Laws.

320.     Defendant Hospitals annually prepare and submit cost reports to Medicaid and Medicare. These "Annual Cost Reports" are used for a variety of purposes, including by CMS to determine the hospitals' reimbursement under the Medicare programs. *See* 42 U.S.C. § 1395g; 42 C.F.R. § 413.20. Because all Defendant Hospitals participate in the Medicare program as well, they all must submit these Annual Cost Reports.

321.     Annual Cost Reports are submitted using form CMS-2552-10, which is a lengthy form prepared by CMS.

322.     In their Annual Cost Reports, hospitals must report a variety of information that Medicare uses to calculate hospital reimbursements under Medicare and for making other payment decisions. Some of these calculations depend on the hospitals' reimbursements from state Medicaid programs.

323.     For example, in their Annual Cost Reports submitted using CMS-2552-10, hospitals, including Defendant Hospitals, must report the

nursery charges for which they have been reimbursed by Medicaid programs during the year. The annual report requires hospitals to aggregate their Medicaid payments for the entire year. The integrity and accuracy of the annual cost report therefore depends on the integrity and accuracy of each individual bill (UB-04) that the hospitals submit throughout the year.

324.    By submitting Annual Cost Reports on CMS-2552-10, Defendant Hospitals made express certifications of compliance with the laws applicable to the information contained in the cost reports. In particular, Defendant Hospitals' Annual Cost Reports all contained a "CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)" on the first page of the reports.

325.    Pursuant to the certification language in each Annual Cost Report, Defendant Hospitals' management "certify" that the "report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions" and "further certify that [they are] familiar with the laws and regulations regarding the provision of health care services, *and that the services identified in this cost report were provided in compliance with such laws and regulations.*" (*See* CMS-2552-10 (emphasis added).)

326.    In other words, Defendant Hospitals certify in each Annual Cost Report that the services reflected in the cost report, which includes NICU services reimbursed by Medicaid, were "provided in compliance" with "the laws and regulations regarding the provision" of such NICU services, including the laws, regulations, and rules set forth above.

### E.    Materiality: Defendants' False Certifications and Claims Are Material.

327.    A false statement is material under the False Claims Act if either (1) a reasonable person would likely attach importance to it or (2) the defendant knew or should have known that the government would attach importance to it.

328.    Materiality is a holistic assessment, including four non-exclusive factors: (1) whether the legal requirement violated is expressly stated in a statute, regulation, or contract, (2) whether the violation goes to the essence of the bargain, (3) whether the violation is significant rather than minor or insubstantial, and (4) whether the Government has taken action in response to similar, known violations. None of these factors is absolutely required, and none is alone dispositive.

1.   **The Applicable Laws, Regulations, and Contractual Provisions Condition Defendant Hospitals' Payments on their Compliance with Applicable Billing Requirements.**

329.   As alleged above, Defendant Hospitals' billing practices have express prohibitions contained in statutes, regulations, and contractual provisions.

330.   The most basic requirement for reimbursement eligibility under Medicaid and Medicare is that the service provided must be reasonable and medically necessary. (Utah Medicaid Provider Manual, Section I: General Information, July 2018, p. 30; *id.* (March 2026) at 54–55 (same).)

331.   To be medically necessary, another "equally effective" service cannot have been "substantially less costly." (*Id.* (July 2018) at 14, 30; *id.* (March 2026) at 20 (same).)

332.   Additionally, Congress itself enacted the prohibition on states paying Medicaid providers more than their usual and customary rates, and required states to include mechanisms for ensuring compliance with that restriction was built into their state Medicaid plans, because Congress intended providers, such as Defendant Hospitals, to bill Medicaid programs using their ordinary, standard rates. 42 U.S.C. § 1396b(i).

333. HHS's implementing regulations condition every Medicaid payment on compliance with the restriction that such payment does not exceed the provider's customary charges. 42 C.F.R. § 447.271 (state Medicaid plan "may not pay a provider more for inpatient hospital services under Medicaid than the provider's customary charges to the general public for the services"); *id*. § 447.250.

334. Utah's Medicaid program ensures compliance with the restriction by paying hospitals according to the payment system outlined in its state plan, which uses a DRG-based reimbursement system augmented by outlier payments. That payment system depends on hospitals submitting claims that accurately and truthfully reflect their customary charges for such services. (*See* Attachment 4.19-A.)

335. Utah's Medicaid program conditions payment of claims on certifications by the providers that their bills comply with all applicable laws, regulations, policies, and procedures, including any policies of MCOs that apply. This, of course, includes policies regarding medical necessity and charging for services at a greater rate than charged to the general public. (*See* Utah Provider Agreement for Medicaid (3/1/11 v.) at 4 (Provider agrees to "[s]ubmit claims for services in accordance with the Medicaid policy in effect at the time

of service"); Utah Medicaid Provider Manual, Section I: General Information, July 2018, p. 7 ("Payment for services is made in accordance with the policy and fee schedule in effect at the time services are rendered. The provider rendering services is responsible to be aware of and comply with the policies and procedures in the Utah Medicaid Provider Manual . . . and applicable policies and procedures of managed care plans. Compliance with all applicable Utah state laws, regulations, and administrative guidelines is required of all providers."); *id.* (March 2026) at 10 (same).)

> **2.    Compliance with Billing Regulations and Properly Billing Medicaid Programs Is Critical to the Integrity of the Medicaid System and Goes to the Essence of the Bargain.**

336.    Requirements that hospitals comply with medical necessity standards, bill their usual and customary charges, and refrain from engaging in schemes that unnecessarily increase costs to Medicaid are fundamental concepts in the field of Government healthcare programs.

337.    The laws, regulations, and contractual provisions that Defendant Hospitals have violated here relate to the "price" they are permitted to charge for their services. Price is a material term of every contract—exchanging money for services—no such contract can be formed without an agreement about the price. Here, the parties agreed on the price Defendant

Hospitals could charge Utah's Medicaid program, and Defendant Hospitals repeatedly certified that their billed charges complied with this agreement.

338. Moreover, the laws, regulations, and contractual provisions that Defendant Hospitals violated were enacted to combat efforts by unscrupulous providers to gouge Medicaid by charging the program inflated rates.

339. Indeed, after the adoption of the DRG-based payment system with outlier payments in the Medicare program, HHS addressed the problem of "turbocharging" by implementing regulations intended to address the most excessive cases of turbocharging. *See* 42 C.F.R. § 412.84(i); 68 Fed. Reg. 34515 (June 9, 2003). But even those regulations have failed to completely curb the practices in the Medicare program, as the examples below demonstrate. In any event, federal authorities have recognized the practice violates the law and constitutes healthcare fraud, and they have taken action to prevent and uncover such practices.

340. Accurate and truthful billing, including Medicaid billing, is vital to the integrity of the federal Medicare program. CMS requires Defendant Hospitals to report their Medicaid reimbursements for NICU services as part of their Annual Cost Reports to Medicare. CMS uses the information to make adjustments to reimbursement rates and related factors.

### 3.    The False Claims Were Systemic and Widespread, Not Minor and Insubstantial.

341.    Defendant Hospitals' violations of the FCA were not trivial. On the contrary, the violations have stretched over a decade, involving likely thousands of claims for payment to the Utah Medicaid program, and resulted in the overpayment of likely tens of millions of dollars from the Utah Medicaid program.

342.    Moreover, the turbocharging practices were not the result of a "bad apple." On the contrary, Defendant Hospitals' billing practices were systematic, calculated, and considered. Defendant Hospitals carried out the fraudulent billing practices at the three hospitals—St. Mark's, Timpanogos Regional, and Ogden Regional—where such practices had the largest and most lucrative financial impact for Defendant HCA.

343.    Perhaps most salient on this factor is that Defendant Hospitals were aware that their billing practices were wrongful, acknowledged the need to modify their billing practices, and yet after being informed by Relators and many others that the billing practices were in violation of the law, Defendant Hospitals not only failed to stop billing Medicaid in contravention of the law and failed to report their prior overpayments from such billing practices, but continued to bill Utah's Medicaid program using the same practices.

344. Worse, after Defendant HCA found out that the billing practices were under scrutiny by government investigators, Defendant HCA doubled down, using its economic leverage over the MCO to which it submits most of its NICU claims in Utah (Molina) to demand that Molina help Defendant Hospitals hide the illicit NICU claim overpayments through a different billing artifice—a billing scheme that negates entirely one of Molina's most important claims review programs. Defendant Hospitals and HCA knew about the problems with their NICU billing practices in Utah, but rather than admit wrongdoing and returning the overpayments, Defendants invented a new way to "hide their tracks."

**4. The Government Has Taken Actions Against Many Hospitals Who Have Used False Billing Information to Inflate their Medicaid Reimbursements.**

345. The United States has pursued enforcement actions against hospitals for similar billing practices as Defendant Hospitals'.

346. In 2006, the United States settled what was then "the largest single settlement in the nearly 150-year history of the False Claims Act" against Tenet Healthcare Corporation. Of the $840 million FCA settlement, $788 million was to resolve "Tenet's receipt of excessive 'outlier' payments," particularly the allegation that the hospitals had "inflated their charges sub-

stantially in excess of any increase in the costs associated with patient care – a practice known as 'turbocharging'" in order to obtain outlier payments. (News Release, United States Attorney for Central District of California, June 29, 2006.)

347.     In 2012, the United States filed claims under the FCA against Beth Israel Medical Center for identical practices of inflating billed charges to obtain outlier payments. The United States settled the case for more than $13 million in 2012. (Stipulation and Order of Dismissal, 12 Civ. 1510 (S.D.N.Y. 2/29/2012).)

348.     In 2008, the United States filed claims under the FCA against Robert Wood Johnson University Hospital for identical practices of inflating charges to obtain outlier payments. The United States settled the case for $6.35 million in 2010. (Press Release, Department of Justice, March 19, 2010.)

349.     In 2010, the U.S. Attorney for the Central District of California settled claims alleging that the Saint John's Health Center "submitted false inflated claims to the Medicare program for 'outlier payments'" for $5.25 million before filing a complaint. (Press Release, U.S. Attorney's Office, Central District of California.)

350. In 2024, the DOJ announced a $30.6 million dollar settlement against Silver Lake Hospital "for claiming excessive cost outlier payments from the Medicare program." As the DOJ noted at the time, outlier "payments were not intended to serve as a private source of enrichment for hospitals unrelated to the actual costs incurred in providing such care." (*See* Press Release, *available at* https://www.justice.gov/archives/opa/pr/new-jersey-hospital-and-investors-pay-united-states-306-million-alleged-false-claims-related.)

**F.    Scienter: Defendants Knowingly Made False Certifications and Knowingly Submitted False Claims.**

**1.    After First Claiming their Billing Practices Were Permissible, Defendant Hospitals Then Admitted their Billing Practices Are Improper and Should Be Corrected, Only to Try to Later Hide the Improper Overpayments.**

351. Defendant Hospitals have been repeatedly informed by Relators and others that their practices of billing the same daily rate for different revenue codes representing very different levels of care is wrong and improper.

352. As alleged above in Part IV.B, Defendant Hospitals have admitted that their practices are incorrect and improper.

353. As alleged above, Defendant Hospitals have admitted that they have billed other payors in Utah exactly the same way, including other MCOs and Utah Medicaid itself.

354. As alleged above, Defendant Hospitals once admitted that they need to change their billing practices because they were incorrect and inappropriate.

355. And, as alleged in Part IV.B, once Defendants learned that their practices were under investigation, they attempted to hide the overpayments under scrutiny (those to Molina) by forcing Molina to agree to a different payment scheme—one that avoids all scrutiny typically given to NICU claims by MCOs *and* continues the "historical" "overpayments" that Defendant Hospitals had received to that point.

356. Taking actions to try to hide a practice is evidence that the person (or entity) taking those actions is aware the practices would be questioned if known. It is evidence of a guilty mind.

### 2. Defendant Hospitals' Billing Practices Appear Designed to Circumvent Federal Restrictions on Similar Billing Practices.

357. As noted above, the federal Medicare program has taken steps to prevent and identify "turbocharging" practices in the Medicare program.

358. But because the vast majority of NICU services reimbursed by Government healthcare programs are provided through state Medicaid programs instead of Medicare, NICU services present a unique opportunity for an

unscrupulous hospital to "turbocharge" in order to receive greater Government healthcare program payments while managing to avoid detection under the Medicare regulations.

359.     It is hard to conceive of a better scheme to obtain outlier payments through turbocharging while avoiding the scrutiny of CMS and other federal officials than the one Defendant Hospitals have engaged in here.

360.     Defendant Hospitals' billing practices also exploit a reporting flaw in UB-04 (or 837I protocol), which does not require hospitals to list their rates for the NICU service revenue codes. Because only "total" charges are identified in UB-04, Defendant Hospitals exploited that vulnerability by charging the same rate for each revenue code. There was no indication on the face of the UB-04 claims (or electronic submissions) that Defendant Hospitals were billing using the same rate at each level.

**3.     Defendant Hospitals Are Repeatedly Reminded in Regulations, Contracts, and Contract Appendices that Falsifying Billing Information Is a Serious Violation.**

361.     As alleged above, Defendant Hospitals are repeatedly reminded that they must submit claims only for medically necessary services, that they must provide accurate and correct billing information when doing so, and

that the failure to do so is a serious violation of the rules and regulations that govern such claims.

362.   Defendant Hospitals acknowledge every time they submit a claim on form UB-04, which includes all the claims addressed in this complaint, that they understand the legal implications of providing false information:

> UB-04 NOTICE: THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).

(UB-04 Standard Certifications.)

### 4.   Defendants Are Well Aware of How their Billing Practices Affect their Payments from Utah's Medicaid Program.

363.   The facts alleged above, relating to the process by which Defendant Hospitals submit claims, how those claims are processed, and how and why certain claims qualify for outlier payments are all well known to Defendants, including to Defendant Hospitals.

364.   Not only did Molina representatives, including Relators, expressly notify Defendants that their improper billing practices were having this

128

very effect, and not only did Defendant Hospitals' management acknowledge these facts, but anyone familiar with the system, as Defendants are, knows that the greater the billed charges on any given claim, the greater the likelihood of outlier payments on that claim, all else being equal. If the charges are valid and legitimate, that is fair compensation; if the charges are inflated, that is intentional fraud.

### 5.    Many Other HCA-affiliated Hospitals in Utah Bill Correctly.

365.    HCA operates at least seven hospitals in Utah that participate in the Utah Medicaid program and bill for NICU services—the three Defendant Hospitals, along with four smaller hospitals that provide comparatively fewer NICU services. Those other four hospitals are Lakeview Hospital, Mountain View Hospital, Brigham City Hospital, and Lone Peak Hospital.

366.    Although the other four HCA hospitals generally provide fewer NICU services because, among other things, they cannot provide the same levels of NICU care as Defendant Hospitals, the other four still provide a substantial amount of NICU services to Medicaid-eligible patients and submit a significant number of claims to Utah's Medicaid program.

367.    Until they all switched to a so-called per diem rate in 2024, none of the other four HCA hospitals engaged in the billing practices adopted

by Defendant Hospitals. In other words, all of them differentiated their daily billing rates based on the revenue codes they reported for each day's NICU services.

368.     HCA, Mountain Division, and Defendant Hospitals are aware of how billing NICU services should be performed—related hospitals under the same system, same contract, and same management submitted correct bills dozens of times per year until 2024. Defendant Hospitals, by contrast, never did—and have not since at least 2011.

369.     Because Defendant Hospitals perform, and therefore bill for, more NICU services than the other HCA hospitals in Utah, the effects of Defendant Hospitals' billing practices on Utah's Medicaid program are magnified. Put another way, Defendants target the systems' hospitals whose Medicaid payments will be most greatly affected by the improper billing practices.

## V.     CLAIMS FOR RELIEF.

### A.     First Claim for Relief: Overcharging under 31 U.S.C. § 3729(a)(1)(A)

370.     Relators incorporate the foregoing paragraphs as if set forth herein.

371.     For violations occurring on or after May 20, 2009, the false claims provision of the FCA, 31 U.S.C. § 3729(a)(1)(A) (2009), provides that

any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" shall be liable to the United States Government.

372. A claim is "false" if it claims an entitlement to money that the claimant cannot rightfully claim.

373. Since at least 2011, Defendant Hospitals have done just that by overcharging Utah Medicaid and its MCOs for NICU services. Specifically, Defendant Hospitals have charged Level IV (or higher) rates for Level II and Level III care, and they have used these inflated rates to push a tremendous percentage of their claims into outlier status, causing increased payments above the DRG amount.

374. Each claim for payment that charged inflated amounts for Level II or Level III care is a false claim.

375. Defendants presented such claims knowingly because they knew, or at least were aware of a substantial risk, that they were charging more money for care than was warranted—and also knew that a high percentage of their claims were pushed into outlier status, resulting in overpayments.

376. Defendants' violations were material because they caused Utah Medicaid and its MCOs to pay more money to Defendant Hospitals than

they lawfully should have.

377.     Each such claim that caused outlier payments is a false claim that caused damages to the government in an amount to be determined at trial.

**B.     Second Claim for Relief: Express False Certifications under 31 U.S.C. § 3729(a)(1)(A).**

378.     Relators incorporate the foregoing paragraphs as if set forth herein.

379.     An express false certification theory applies under 31 U.S.C. § 3729(a)(1)(A) when a government payee falsely certifies compliance with a particular statute, regulation, or contract term, where compliance is material to the government's payment decision.

380.     Here, Defendant Hospitals made expressly false certifications when they submitted hundreds of claims to Utah Medicaid, either directly or through MCOs, using mandated form UB-04 (or its electronic equivalent), which requires Defendant Hospitals to make several express certifications about the submitted claims' compliance with specific rules and regulations governing the claim. On information, Relators believe and allege that Defendant HCA and Defendant Mountain Division caused and directed Defendant Hospitals to make such claims in the manner they made them, including in the use of the inflated billing rates.

381. Additionally, Defendant Hospitals, under the direction of Defendant HCA and Defendant Mountain Division, made express false certifications in their Annual Cost Reports about the accuracy of the claims that were reflected in each annual report, and specifically that each claim reflected the annual report complied with specific laws and regulations. Defendant Hospitals made these statements knowing that their claims for NICU services did not comply with such laws and regulations.

382. Defendant Hospitals submitted the claims to Utah's Medicaid program knowing that the claims did not comply the applicable rules and regulations with which they certified compliance.

383. These false express certifications induced Utah's Medicaid program (either directly or through MCOs), which is funded in large measure by the United States Government, to make payments to Defendant Hospitals in much greater amounts than Defendant Hospitals were entitled to receive had the hospitals' certifications of compliance with the applicable rules and regulations governing their billing practices been true.

384. Because of the Defendants' conduct set forth in this Claim, the United States has suffered actual damages, with the exact amount to be determined at trial.

**C.**     **Third Claim for Relief: Implied False Certifications under 31 U.S.C. § 3729(a)(1)(A).**

385.     Relators incorporate the foregoing paragraphs as if set forth herein.

386.     In addition and in the alternative, Defendants are liable for their violations of 31 U.S.C. §3729(a)(1)(A) for submitting claims that implied that the billed charges were usual and customary, were accurate and correct, and were free of misrepresentations.

387.     The elements of an implied false certification claim are (1) there was a false or fraudulent claim that made specific representations about the goods or services provided, (2) the defendant knew the claim was false, and (3) defendant presented the claim or caused it to be presented for payment.

388.     Here, Defendant Hospitals, at the direction of Defendant HCA and Defendant Mountain Division, submitted hundreds of claims to Utah's Medicaid program using specific revenue codes that corresponded to the level care Defendant Hospitals supposedly provided to a Medicaid-eligible patient and that should have also corresponded to the rate Defendant Hospitals' charged for such services.

389.     Utah's Medicaid Provider Manual, which applies through the Provider Agreements, identifies several specific certifications that providers

impliedly make with every claim submission, whether or not the claim form actually includes such certifications, including that the service is medically necessary, that the claim complies with all applicable coding guidelines (like the NUBC), and that the "[t]he payment claimed does not exceed the provider's usual and customary charges." (The MCOs' Provider Manuals, which supplement the Utah Medicaid Provider Manual for those claims, contain the same requirements and restrictions.)

390.     Defendant Hospitals submitted the claims to Utah's Medicaid program (including to MCOs) knowing that the claims did not comply the applicable rules and regulations governing their use of the Revenue Codes in the claims.

391.     These false implied certifications induced Utah's Medicaid program (either directly or through MCOs), which is funded in large measure by the United States Government, to make payments to Defendant Hospitals in much greater amounts than Defendant Hospitals were entitled to receive had the hospitals' implied certifications of compliance with the applicable rules and regulations governing their billing practices been true.

392.    Because of the Defendants' conduct set forth in this Claim, the United States has suffered actual damages, with the exact amount to be determined at trial.

### D.    Fourth Claim for Relief: False Records or Statements under 31 U.S.C. § 3729(a)(1)(B).

393.    Relators incorporate the foregoing paragraphs as if set forth herein.

394.    The FCA makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (2009).

395.    The elements of an express false certification claim under the false statements provision of the FCA are (1) an express false record or statement, (2) made with requisite scienter, (3) that had a natural tendency to influence, or be capable of influencing, the payment of a false claim.

396.    Defendant Hospitals made expressly false records and statements when they submitted hundreds of claims (including to MCOs) using mandated form UB-04 (or the electronic equivalent), which requires Defendant Hospitals to make several certifications about the submitted claims' compliance with applicable rules and regulations governing the claim. On information, Relators believe and allege that Defendant HCA and Defendant

Mountain Division caused and directed Defendant Hospitals to make such statements.

397.    Defendant Hospitals, under the direction of Defendant HCA and Defendant Mountain Division, also made express false statements in their Annual Cost Reports about the accuracy of the claims that were reflected in each annual report, and specifically that each claim reflected the annual report complied with applicable laws and regulations. Defendant Hospitals made these statements knowing that their claims for NICU services did not comply with such laws and regulations.

398.    These false certifications of compliance had the natural tendency to influence, and did in fact influence, the payment of these claims by Utah's Medicaid program (either directly or through MCOs), which is largely funded by the United States Government. Without these false certifications and statements, Defendant Hospitals' claims would not have been paid.

399.    Because of the Defendants' conduct set forth in this Claim, the United States has suffered actual damages, with the exact amount to be determined at trial.

**E.** **Fifth Claim for Relief: Causing MCOs to Present False Claims under 31 U.S.C. § 3729(a)(1)(A).**

400.    Relators incorporate the foregoing paragraphs as if set forth herein.

401.    As explained above, Defendant Hospitals overcharged Utah Medicaid's MCOs for NICU services. As a result, the MCOs' own costs were unlawfully inflated.

402.    MCOs' costs are a critical input in determining the capitation payments owed to the MCOs in future years. Higher costs mean that the Medicaid program pays higher capitation payments prospectively.

403.    Defendant Hospitals knew, or were at least aware of a substantial risk, that by inflating their claims to MCOs, they would cause the MCOs to report higher costs to the Government than they lawfully should, which would in turn cause the Government to pay the MCOs more than it lawfully should.

404.    Each claim (i.e., encounter data submission) presented by the MCOs to the government that was inflated due to Defendant Hospitals' fraud is an actionable false claim that caused damages to the Government.

405.    Because of the Defendants' conduct set forth in this Claim, the United States has suffered actual damages, with the exact amount to be determined at trial.

**F.      Sixth Claim for Relief: Reverse False Claims under 31 U.S.C. § 3729(a)(1)(G).**

406.      Relators incorporate the foregoing paragraphs as if set forth herein.

407.      The reverse false claims act provision, 31 U.S.C. § 3729(a)(1)(G), imposes liability on any person "who knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."

408.      Congress defined "obligation" under the False Claims Act to mean "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment . . . ." 31 U.S.C. § 3729(b)(3).

409.      As alleged above, Defendants had actual knowledge of the substantial overpayments they have received as a result of their improper billing practices, Defendants have acknowledged knowing this information to Molina representatives, and yet Defendants have taken no steps to account for and repay such overpayments in the more than nearly eight years that have passed since they were informed about these facts. To the contrary, Defendants have taken action to hide their continued receipt of these overpayments.

410.     Through the foregoing conduct, the Defendants have knowingly and improperly avoided an obligation to repay funds owed the United States, as primary funding source for Utah's Medicaid program, by improperly failing to disclose and return these overpayments. The United States has been damaged, to the extent of its portion of funding to Utah's Medicaid program, by the difference in the payments Defendant Hospitals and Defendants received from Utah's Medicaid program and what they should have received had Defendant HCA directed the other Defendants to bill Utah's Medicaid program properly.

**G.   Seventh Claim for Relief: Conspiring to Commit Violations of 31 U.S.C. § 3729(a)(1).**

411.     Relators incorporate the foregoing paragraphs as if set forth herein.

412.     Under the conspiracy provision of the FCA, a person who "conspires to commit a violation" of 31 U.S.C. §§ 3729(a)(1)(A), (1)(B), or (1)(G) may also be liable to the Government.

413.     As described above, Defendants have separately conspired with Molina to commit violations of the FCA, including 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G).

414.     Defendants and Molina have separately agreed to avoid their

obligations to CMS and the Utah Medicaid program, including conspiring to avoid the medical necessity and correct coding and billing obligations of Defendant Hospitals, as well as the program integrity and utilization management obligations of Molina to review and audit claims submitted by Defendant Hospitals for medical necessity and correct coding and billing, among other requirements.

415.    As described above, Defendant Hospitals and Molina have entered into an agreement to commit violations of the FCA, including 31 U.S.C. § 3729(a)(1)(A), (B), and (G), and to avoid their legal and contractual obligations to CMS and the Utah Medicaid program.

416.    Defendants' false representations and certifications were material to the payment decisions of CMS and the Utah Medicaid program.

417.    Because of the Defendants' conduct set forth in this Claim, the United States has suffered actual damages, with the exact amount to be determined at trial.

## VI.    PRAYERS FOR RELIEF

WHEREFORE, Relators, on behalf of themselves and the United States, demand and pray that judgment be entered in their favor against Defendants, as follows:

418.     On Claims I through VII, for triple the amount of the United States' damages, plus pre- and post-judgment interest to the extent allowed by law, as well as such civil penalties as are allowable by law, together with all costs and such other and further relief as may be just and proper;

419.     That Relators be awarded all reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730 et seq.; and

420.     That because the United States Government has not intervened in this action, Relators be awarded an amount that the Court decides is reasonable, which is not less than 25% nor more than 30% of the proceeds of any award or settlement for those claims.

## VII.  JURY TRIAL DEMAND

421.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators demand a jury trial.

//

DATED this 29th day of April 2026.

/s/ Brandon J. Mark
Brandon J. Mark
Michael Young

PARSONS BEHLE & LATIMER

Tejinder Singh
SPARACINO PLLC

*Attorneys for Relators*

## Certificate of Service

I certify that I electronically filed the foregoing document(s), that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.


/s/ Brandon J. Mark

4929-9813-5696.v2